OSCAR L. TRIGGS, Appellant, *v.* SUN PRINTING AND PUBLISH-
ING ASSOCIATION, Respondent.

LIBEL — WHEN PUBLICATION IS NOT CRITICISM AND CANNOT BE JUSTI-
FIED AS A JEST.    A publication, which in effect represents an author as
a presumptuous literary freak and ridicules his private life, is not within
the bounds of fair and honest criticism, is libelous *per se*, and cannot be
justified upon the ground that it was a mere jest, where it is perfectly
manifest from the language employed that it is an attack upon his repu-
tation or business.

*Triggs* v. *Sun Printing & Publishing Assn.*, 91 App. Div. 259, reversed.

(Argued June 6, 1904; decided August 5, 1904.)

APPEAL, by permission, from an order of the Appellate
Division of the Supreme Court in the first judicial depart-
ment, entered February 25, 1904, which reversed an inter-
locutory judgment of Special Term overruling a demurrer to
the complaint.

This appeal is taken in pursuance of leave granted by the
Appellate Division allowing the appellant to appeal to this
court from such order of reversal and from each and every
part thereof.    That court certified that a question of law has
arisen which, in its opinion, ought to be reviewed by the
Court of Appeals, and stated it as follows : " Does the com-
plaint state facts sufficient to constitute a cause of action ? "
Three libelous articles were complained of.    The first was
published March 2, 1903, and was as follows :

" Triggs in Altruria.    Prof. Oscar Lovell Triggs (meaning
this plaintiff), of the University of Chicago, is the brightest
jewel in Dr. Harper's crown.    Who doesn't know and vener-
ate Triggs ?    Triggs (meaning this plaintiff), the hammer of
hymn writers (meaning this plaintiff contrived to injure the
writers of hymns); the scourge of Whittier and Longfellow
(meaning that plaintiff's criticisms of the poets Whittier and
Longfellow were like a scourge), the panagyrist of Walt
Whitman, who wrote of him in a still unpublished poem, ' I
love young Oscar (meaning plaintiff), a wind of the Northwest,

full of vigor, cheek and elan ' (meaning that plaintiff was full of impudence, and was brazen-faced in his attitude towards the hymn writers and the poets). For some months Prof. Triggs (meaning plaintiff) was collecting and comparing names for his baby. The baby was named at last, redeemed from annonymity, and the proud father (meaning plaintiff) once more had leisure to brood beneficiently over the university and the universe. We have waited, not always with true philosophic patience, for the unfolding of his new thought. We knew that he would not leave the world barren for long. To quote Walt once more : ' Frequent, iterant, dripping and persistent like rain, regular as taxes, a stayer.' And now the god has spoken (meaning and intending to ridicule this plaintiff by likening him to a Deity). At the Cook County League of Women's Clubs, Saturday, Prof. Triggs (meaning this plaintiff) looked into the seeds of time and had a vision of the ' new man.' Hear and tremble, miserable homuncules of to-day. ' The business man of the future would not be recognized by the business man of to-day. The present order of man will pass away. There shall come a new humanity. Notice the passing of patriotism, which is merely an expanded egotism. Notice the new state of diplomacy. All this points to the new era when the social spirit will prevail, when the selfish, the egotistic motive will be gone. The business man will wish to share his successes with the rest of society.' We hate to differ with Prof. Triggs (meaning this plaintiff), but his remarks about patriotism are reported incorrectly or there is some kink in his definition. If patriotism is expanded egotism, what is Triggs ? If Triggs and patriotism are one, how can patriotism ' pass ?' (Meaning this plaintiff, and meaning that this plaintiff is an example of expanded egotism or more, or that he is devoted to self and selfishness.) We are ready to believe in the ' new humanity ' and to welcome it, but what is new humanity without the same old and ever young Triggs (meaning this plaintiff) ? Insisting that Triggs must and shall be preserved, let us cast an admiring glance at the business man of the

10

future. He will share his successes with the rest of society. It would be Philistine to call for a bill of particulars. The new business man will divide his profits among his customers or among the whole community. The individual dividends may not be large, but they will show a kindly spirit in the divider. Presumably the customers or the community will consent to be assessed in case the business loses money. Let altruism have its perfect work. It may be hard for a thoroughly new business man to resist the temptation to give his goods away. As for Triggs (meaning this plaintiff), and all other altruistic professors of the Chicago University, they will pay Dr. Harper for the privilege of working for him. Already some of them delight to prepare for the new order by giving themselves away (meaning that this plaintiff should perform his services to the University of. Chicago gratuitously or without pay or that this plaintiff is not worthy of his hire).''

The next article was published April 6, 1903, and was :

'' The news that Professor Oscar Lovell Triggs (meaning this plaintiff) of the University of Chicago may appear as a theatrical advance agent will give joy to every friend of higher education in America. Such a dazzling promotion for Professor Triggs (meaning this plaintiff) must at once make college teaching more attractive to ambitious young men. Hitherto the complaint has been that the pay is small and the work leads to nothing more. A young man who might have been a lawyer with an income ranging from $8,000 upwards, with a prospect of a seat on the bench or perhaps a brilliant political career, might reasonably have hesitated before becoming a professor with an income of $3,000 or $4,000 at the utmost, and no brass bands and skyrockets. But Professor Triggs has blazed the way to new glories (meaning and intending to ridicule this plaintiff and to compare him with a brass band or skyrockets). For years he (meaning this plaintiff) has been showing his colleagues that a professor of mettle can, himself, be both a brass band and a skyrocket. And now a theatrical manager offers him the exceeding great reward of $700 a week

to travel ahead of a play called 'Romeo and Juliet,' placing the stamp of professional approval upon this production of a hitherto unknown author, and assure the good people of Indiana and Illinois that in his way Shakespeare is the equal of Gen. Lew Wallace or even Professor William Cleaver Wilkinson of the University of Chicago. This is fine, and all the more so because, if Professor Triggs (meaning this plaintiff) keeps on developing he will inevitably become the whole show himself (meaning and intending to ridicule and scoff at this plaintiff by charging him with sensationalism and misconduct in his profession, and with an intent to monopolize the duties of the department of English at the University of Chicago, and of incompetency, and a lack of dignity and of ability).

The last article was published April 10, 1903, and was as follows: "Triggs and Romeo. To men of good liver, life is full of happiness. To us it is, and long has been, one of the greatest of these felicities to guide amateurs to Prof. Oscar Lovell Triggs (meaning this plaintiff), a true museum piece and the choicest treasure in Dr. Harper's collection (meaning and intending to ridicule this plaintiff, by referring him to a museum piece, or a freak or a curiosity, and by characterizing him as the principal attraction in a collection of other museum pieces, freaks and curiosities). We cannot boast of having discovered Triggs (meaning this plaintiff), for he was born great, discovered himself early and has a just appreciation of the value of this discovery (meaning that plaintiff in his work is governed by personal conceit, or an inflated idea of his own importance, and of the value of his work in the University of Chicago). But in our humble way we have helped communicate him (meaning plaintiff) to the world, assisted in his effusion and diffusion and beckoned reverent millions to his shrine. We have joyed to see him (meaning this plaintiff) perform three heroic labors, viz.: 1. 'Knock out' old Whittier and Longfellow. 2. 'Do up' the hymn writers. 3. 'Name his baby at the end of a year of solemn consultation' (meaning and intending to charge that plaintiff in his profession and in

his position as an instructor in the department of English at the University of Chicago, had little or no regard for the value of the writings of the established poets, Whittier and Longfellow, or the writers of hymns, and intending to place him in a ridiculous and odious attitude by a reference to his private life and to domestic affairs). But these achievements are only the bright beginning of a long course of halcyon and and vociferous proceedings. As yet, Prof. Triggs is but in the bud (meaning and intending this plaintiff and meaning and intending to place him in a ridiculous and odious position). He (meaning this plaintiff) came near blossoming the other day, and the English drama would have blossomed with him. A firm which is to produce ' Romeo and Juliet' offered him $700 a week to be the 'advance agent' of the show and to 'work up enthusiasm by lecturing.' Prof. Triggs (meaning this plaintiff) was compelled to decline the offer, but the terms of his refusal show that it is not absolute, and that ' some day' as the melodramas cry, he will illuminate Shakespeare, dramatic literature and the public mind: ' I regret my inability, at this time, to take advantage of this opportunity, for the plan proposed seems to me to be an excellent one. I would regard it, from my point of view, as an educational opportunity. It would gratify me to be able to present my views on drama, on Shakespeare and on this particular play to audiences that would gather together from a serious interest in the drama itself. This would be a form of ' university extension' not hitherto tried, and which should be attended with good educational results — such as I would desire and such also as I assume you would desire.' The nap is worn off the phrase ' university extension.' What Prof. Triggs (meaning this plaintiff) proposes and the country hungers for is Triggs (meaning this plaintiff) ' extension.' He must not give up to Chicago what was meant for mankind. His views on any subject are impressive, but on Shakespeare they would be as authoritative and final as it is his genius to be. As we have watched him (meaning this plaintiff) swatting Whittier and Longfellow, we have felt like yelling: ' What art thou

drawn among these heartless hinds?' (Meaning and intending to ridicule and disgrace this plaintiff by placing him in a ridiculous and odious position with his associates in the Department of English at the University of Chicago and among English critics generally.) The professor (meaning this plaintiff) should take a man more nearly of his size. The Shakespeare legend should be allowed to delude no more. Prof. Triggs (meaning this plaintiff) can be depended upon to reduce this man Shakespeare to his natural proportions, club the sawdust out of that wax figger of literature and preach to eager multitudes the superiority of the modern playrights, with all the modern improvements (meaning and intending to ridicule and disgrace this plaintiff by placing him in a ridiculous, odious and contemptible position, and by attacking him in his position as an instructor in the Department of English, and as a critic and writer of English generally). The so-called poetry and imagination visible in this Stratford Charlatan's plays must be torn out, deracinated, the fellow (meaning this plaintiff) would call it, in his fustian style (meaning this plaintiff, and meaning and intending to charge that this plaintiff in his lectures refers to Shakespeare in a derogatory way and as a charlatan play writer and dramatist, and that the plaintiff in his criticisms and in his lectures before the students of the University of Chicago, would advise a change in the poetry and imagination of Shakespeare, and would have the presumption to insert his own style, which defendant charges is a fustian style, meaning inflated, bombastic, pompous and turgid, and thereby defendant attacks plaintiff in his profession and in his position as a writer and lecturer, and attempts to place him in a ridiculous, odious and contemptible position). If these plays are to be put upon the stage, they must be rewritten; and Prof. Triggs (meaning this plaintiff) is the destined rewriter, amender and reviser. The sapless, old-fashioned rhetoric must be cut down. The fresh and natural contemporary tongue, pure Triggsian, must be substituted. For example, who can read with patience these tinsel lines?

'Madam, an hour before the worshipped sun peered forth the golden window of the east, a troubled mind drave me to walk abroad.' This must be translated into Triggsian (meaning the literary style of writing of this plaintiff) somewhat like this: 'Say, lady, an hour before sun-up I was feeling wormy and took a walk around the block' (meaning this plaintiff, and meaning and intending to charge this plaintiff with a gross, illiterate and uncultivated style of address and writing, and intending to place this plaintiff in a ridiculous, odious and contemptible position, and to make him an object of ridicule and derision). Here is more Shakespearian rubbish:

> ' O, she doth teach the torches to burn bright!
> Her beauty hangs upon the cheek of night,
> As a rich jewel in an Ethiop's ear.'

How much more forcible in clear, concise Triggsian: 'Say, she's a peach! A bird!' (Meaning this plaintiff, and meaning and intending to charge this plaintiff with a gross, illiterate and uncultivated style of address and writing, and intending to place this plaintiff in a ridiculous, odious and contemptible position, and to make him an object of ridicule and derision.) Hear 'Pop' Capulet drivel: 'Go to, go to, You are a saucy boy!' In the Oscar (meaning this plaintiff) dialect, this is this: 'Come off, kid. You're too fresh.' (Meaning this plaintiff, and meaning and intending to charge this plaintiff with a gross, illiterate and uncultivated style of address and writing, and intending to place this plaintiff in a ridiculous, odious and contemptible position, and to make him an object of ridicule and derision.) Compare the dropsical hifalutin:

> ' Night's candles are burnt out, and jocund day
> Stands tiptoe on the misty mountain's tops,'

with the time-saving Triggsian version: 'I hear the milkman.' (Meaning this plaintiff, and meaning and intending to charge this plaintiff with a gross, illiterate and uncultivated style of address and writing, and intending to place this plaintiff in a ridiculous, odious and contemptible position, and to make him an object of ridicule and derision.) The downfall of Shakespeare is only a matter of time and Triggs (meaning

this plaintiff, and meaning and intending to charge that a continuation of the lecture work of this plaintiff at the University of Chicago will end in the revulsion of sentiment against the writings of the famous Shakespeare, and intending to place this plaintiff in an odious and contemptible position among all lovers of the writings of Shakespeare and with the public generally).    Carnegie ought to endow Triggs (meaning this plaintiff).    Oscar Hammerstein ought to dramatize Triggs (meaning this plaintiff).    Triggs is the hope, and soon will be the pride, of the stage.    He ought to have not less than $7,000 a week for fifty-three weeks a year (meaning to cast a slur on the literary attainments, and intending to ridicule, deride, scoff at and denounce the high literary character and the unquestioned ability of this plaintiff, and to attack him in his profession as a lecturer and writer at the University of Chicago, and to bring about his removal from his official position and from his high standing with the public generally)."

To the complaint the defendant demurred upon the ground that it did not state facts sufficient to constitute a cause of action.    The issue of law thus raised was tried at the Special Term, and the court found : 1. That the complaint states facts sufficient to constitute a cause of action ; and, 2. That the statements complained of are libelous *per se.*    It thereupon directed an interlocutory judgment overruling the demurrer, with costs, with leave to the defendant to answer within twenty days upon payment of costs and in default that final judgment should be entered.    The defendant appealed from such interlocutory judgment to the Appellate Division, where it was reversed and the demurrer of the defendant sustained, with costs, with leave to the plaintiff to amend his complaint.    Thereupon he appealed from the order of the Appellate Division by permission of that court.

*Otto T. Hess* and *James W. Osborne* for appellant.    Libel is a writing which sets a man in an odious or ridiculous light, and thereby diminishes his reputation.    (Chase's Blackstone

[3d ed.], 682; *White* v. *Nichols*, 3 How. [U. S.] 266; *Hilhouse* v. *Dunning*, 6 Conn. 407; *Morey* v. *M. J. Assn.*, 124 N. Y. 207; Merrill on Newspaper Libel, 40; *Cooper* v. *Greeley*, 1 Den. 347; Bouvier L. Dict., 528; Penal Code, § 242; *Moore* v. *Francis*, 121 N. Y. 199; *Gates* v. *N. Y. R. Co.*, 155 N. Y. 228.) Whatever words have a tendency to hurt or are calculated to prejudice a man who seeks his livelihood by any trade or business are actionable. (*Krug* v. *Pitass*, 162 N. Y. 154; *Mattice* v. *Wilcox*, 147 N. Y. 624.) The words complained of are libelous, whether referring to the plaintiff as a professor or as an individual. (*Moffatt* v. *Cauldwell*, 3 Hun, 26; *Martin* v. *P. P. Co.*, N. Y. L. J. April 26, 1904.) It is not necessary to allege special damage in the case at bar. (*Mattice* v. *Wilcox*, 147 N. Y. 624; *Shea* v. *S. P. & P. Assn.*, 14 Misc. Rep. 415; *Sanderson* v. *Caldwell*, 45 N. Y. 358; *Queen* v. *Cooper*, L. R. [2 Q. B. D.] 513; *Bergman* v. *Jones*, 94 N. Y. 64; *Gibson* v. *S. P. & P. Assn.*, 71 App. Div. 566; *Morrison* v. *Smith*, 177 N. Y. 366.)

*Franklin Bartlett* for respondent. The words complained of and set forth in the complaint are not libelous *per se* of the plaintiff as an individual. (*Goldberger* v. *P. G. Pub. Co.*, 42 Fed. Rep. 42; *Stone* v. *Cooper*, 2 Den. 293.) The words complained of are not libelous *per se* of the plaintiff in his alleged profession or occupation as an instructor or teacher. (*Cruikshank* v. *Gordon*, 118 N. Y. 178; *Moore* v. *Francis*, 121 N. Y. 199; *Mattice* v. *Wilcox*, 147 N. Y. 624; *Krug* v. *Pitass*, 162 N. Y. 154; *Cooper* v. *Stone*, 2 Den. 299; *Labouisse* v. *E. P. P. Co.*, 10 App. Div. 130; *Battersby* v. *Collier*, 34 App. Div. 347; *Ratzel* v. *N. Y. N. P. Co.*, 67 App. Div. 598.) The complaint contains no averment of special damage. (*Langdon* v. *Shearer*, 43 App. Div. 607; *King* v. *S. P. & P. Assn.*, 84 App. Div. 310.) The articles are not libelous *per se*, because they do not charge the plaintiff with having done anything which he had not a legal right to do. (*Foot* v. *Pitt*, 83 App. Div. 78; *Stone* v. *Cooper*, 2 Den. 301.) The alleged libels are merely criticisms of the

ideas and theories of the plaintiff, and of his literary composi-
tions, and there being no averment of special damage, such
criticism is not libelous or actionable.   (*Carr* v. *Hood*, 1 Camp.
355; *Strauss* v. *Francis*, 4 F. & F. 1107; *Swan* v. *Tappan*,
5 Cush. 104; *Young* v. *Macrae*, 3 B. & S. 264; *Dooling* v.
*B. P. Co.*, 144 Mass. 258; *M. F. A. Co.* v. *Shields*, 171
N. Y. 384; *Dowling* v. *Livingstone*, 66 N. W. Rep. 225.)

MARTIN, J.   This action was for libel.   The defendant
demurred to the complaint upon the ground that it did not
state facts sufficient to constitute a cause of action.   By inter-
posing a demurrer upon that ground, all the facts alleged in
the complaint or which can by reasonable and fair intend-
ment be implied from the allegations thereof, are deemed
admitted.   (*Marie* v. *Garrison*, 83 N. Y. 14; *Sanders* v.
*Soutter*, 126 N. Y. 193, 195; *Ahrens* v. *Jones*, 169 N. Y.
555, 559.)

A written or printed statement or article published of or
concerning another which is false and tends to injure his
reputation and thereby expose him to public hatred, contempt,
scorn, obloquy or shame, is libelous *per se.*   (*Riggs* v. *Den-
niston*, 3 Johns. Cases, 198; *Steele* v. *Southwick*, 9 Johns.
214; *Van Ness* v. *Hamilton*, 19 Johns. 349, 367; *Root* v.
*King*, 7 Cow. 613 ; *Cooper* v. *Greeley*, 1 Denio, 347; *Shelby* v.
*Sun Printing & P. Assn.*, 38 Hun, 474; affirmed, 109 N. Y.
611; *McFadden* v. *Morning Journal Assn.*, 28 App. Div.
508; *Bergmann* v. *Jones*, 94 N. Y. 51, 64; *Moore* v. *Fran-
cis*, 121 N. Y. 199 ; *Morey* v. *Morning Journal Assn.*, 123
N. Y. 207; *Mattice* v. *Wilcox*, 147 N. Y. 624; *Gates* v.
*N. Y. Recorder Co.*, 155 N. Y. 228; *Morrison* v. *Smith*, 177
N. Y. 366.)

When the articles published by the defendant of and con-
cerning the plaintiff are read in the light of the foregoing
principles of law, it becomes obvious, we think, that they
were libelous *per se.*   It seems impossible for any fair-minded
person to read the articles alleged in the complaint without
reaching the conclusion that they were not only intended, but

necessarily calculated, to injure the plaintiff's reputation and to expose him to public contempt, ridicule or shame.

It is contended by the respondent that the articles published were a mere comment or criticism of matters of public interest and concern, and, hence, were privileged. While every one has a right to comment on matters of public interest, so long as one does so fairly, with an honest purpose, and not intemperately and maliciously, although the publication is made to the general public by means of a newspaper, yet, what is privileged is criticism, not other defamatory statements, and if a person takes upon himself to allege matters otherwise actionable, he will not be privileged, however honest his motives, if those allegations are not true. When a publisher goes beyond the limits of fair criticism, his language passes into the region of libel, and the question whether those limits have been transcended may become a question of law but ordinarily presents a question for the jury. (*Fay* v. *Harrington*, 176 Mass. 270.) It is true that an author when he places his work before the public invites criticism, and however hostile it may be, the critic is not liable for libel, provided he makes no misstatements of material facts contained in the writing and does not go out of his way to attack the author. The critic must, however, confine himself to criticism and not make it the veil for personal censure, nor allow himself to run into reckless and unfair attacks merely for the purpose of exercising his power of denunciation. If, under the pretext of criticising a literary production or the acts of one occupying a public position, the critic takes an opportunity to attack the author or occupant, he will be liable in an action for libel. (*Cooper* v. *Stone*, 24 Wend. 434; *Mattice* v. *Wilcox*, 71 Hun, 485, 488; affirmed, 147 N. Y. 624; *Hamilton* v. *Eno*, 81 N. Y. 116.) Moreover, it is difficult to perceive how this privilege can be tried on demurrer, as the question whether the criticism was fair and just or willfully assailed the reputation of the plaintiff, would be for the jury. In this case it is obvious that the articles complained of go far beyond the field of fair and honest criticism, and are

attempts to portray the plaintiff in a ridiculous light. As was in effect said by the learned judge in the dissenting opinion below : The articles complained of represent the plaintiff as illiterate, uncultivated, coarse and vulgar ; and his ideas as sensational, absurd and foolish. They also represent him as egotistical and conceited in the extreme and convey the impression that he makes himself ridiculous both in his method of instruction and by his public lectures. They also ridicule his private life by charging that he was unable to select a name for his baby until after a year of solemn deliberation. In short they effect to represent him as a presumptious literary freak. These representations concerning his personal characteristics were not within the bounds of fair and honest criticism, and are clearly libelous *per se*.

It is likewise claimed by the respondent that these articles were written in jest, and hence that it is not liable to the plaintiff for the injury he has sustained. It is, perhaps, possible that the defendant published the articles in question as a jest, yet they do not disclose that, but are a scathing denunciation, ridiculing the plaintiff. If, however, they can be regarded as having been published as a jest, then it should be said that however desirable it may be that the readers of and the writers for the public prints shall be amused, it is manifest that neither such readers nor writers should be furnished such amusement at the expense of the reputation or business of another. In the language of Joy, C. B. : "The principle is clear that a person shall not be allowed to murder another's reputation in jest ;" or, in the words of SMITH, B., in the same case : "If a man in jest conveys a serious imputation, he jests at his peril." (*Donoghue* v. *Hayes* [1831], Hayes, Irish Exchequer, 265, 266.) We are of the opinion that one assaulting the reputation or business of another in a public newspaper cannot justify it upon the ground that it was a mere jest, unless it is perfectly manifest from the language employed that it could in no respect be regarded as an attack upon the reputation or business of the person to whom it related.

The single purpose of the rule permitting fair and honest

criticism is that it promotes the public good, enables the people to discern right from wrong, encourages merit, and firmly condemns and exposes the charlatan and the cheat, and hence is based upon public policy. The distinction between criticism and defamation is that criticism deals only with such things as invite public attention or call for public comment, and does not follow a public man into his private life or pry into his domestic concerns. It never attacks the individual, but only his work. A true critic never indulges in personalities, but confines himself to the merits of the subject-matter, and never takes advantage of the occasion to attain any other object beyond the fair discussion of matters of public interest and the judicious guidance of the public taste. The articles in question come far short of falling within the line of true criticism, but are clearly defamatory in character and are libelous *per se.*

It follows that the order of the Appellate Division and the interlocutory judgment entered thereon reversing the interlocutory judgment of the Special Term should be reversed, the judgment of the Special Term affirmed, with costs to the appellant in all the courts, and the question certified answered in the affirmative.

PARKER, Ch. J., BARTLETT, VANN, CULLEN and WERNER, JJ., concur; O'BRIEN, J., absent.

Order reversed, etc.