(111 App. Div. 467)

McDONALD v. SUN PRINTING & PUBLISHING ASS'N.

(Supreme Court, Appellate Division, Second Department.    March 16, 1906.)

LIBEL—PUBLICATION LIBELOUS PER SE—IMPROPER CRITICISM.

A newspaper publication, alleging that a student of and writer on criminology and kindred subjects, and a former employé of the government as specialist in education as a preventive of pauperism and crime, entrapped females into disclosing their delicate confidences, and publishing and selling the same, and imputing to him, in reviewing the publication by him of the results of his work, indecent and lascivious conduct toward young girls under the cloak of professional investigation, is libelous per se, and is not within the purview of fair criticism.

[Ed. Note.—For cases in point, see vol. 32, Cent. Dig. Libel and Slander, §§ 81, 84, 88, 145–147.]

Appeal from Special Term, Kings County.

Action by Arthur McDonald against the Sun Printing & Publishing Association. From an interlocutory judgment sustaining a demurrer to the complaint on the ground that it does not state facts sufficient to constitute a cause of action, plaintiff appeals. Reversed.

See 92 N. Y. Supp. 37.

The article complained of, as published by the defendant in its newspaper, reads:

"The Abnormal 'Doctor.'

"Ejected from the Bureau of Education, 'Doctor' Arthur McDonald, the patho-social investigator, is pestering Senators and Representatives with the request that he be enacted into the Department of Justice, and provided with a laboratory there for 'the study of the abnormal classes,' under the supervision of the Attorney General. How eagerly the Department of Justice yearns for the presence and assistance of this patho-social investigator of abnormal femininity may be inferred from a letter written last Saturday by Attorney General Knox to the Secretary of the Charity Organization Society of this City:

" 'Department of Justice,

" 'Washington, D. C. Feb. 21, 1903.

" 'Sir: Replying to your letter of the 18th instant, in which you ask whether this Department has any connection with the bill now pending in Congress to establish a laboratory for the study of the criminal, pauper, and defective classes, I have to say that this department is not a party in any way to the proposed legislation. Respectfully,    P. C. Knox,

" 'Attorney-General.'

"The Department of Justice repudiates 'Doctor' Arthur MacDonald, his abnormal laboratory bill, and the patho-social humbug. This is merely what might be expected of any administrative establishment where sanity and clean habits of thought prevail. That there should be need now of warning Congress against such a measure as Senate Bill 6,032 is a circumstance essentially grotesque to any one who knows the facts about 'Doctor' Mac-Donald and his 'work.' Yet the bill has actually been reported by the Senate Committee on the Judiciary, and is now on the calendar; and it is only about three weeks since the chairman of that committee, the venerable Senator from Massachusetts, in asking for its immediate consideration and passage, referred to this 'Doctor' MacDonald as 'the very earnest and devoted gentleman who has been engaged in that work formerly in the Bureau of Education.' We have already inspected some characteristic specimens of 'Doctor' MacDonald's methods of study. We have seen how he carried his enthusiasm for the investigation of abnormal femininity to the extent of entrapping young girls and foolish married women by means of a personal advertisement, leading them on to the disclosure of their most intimate affairs of the heart

or of sexual propensity, sometimes by letter to him. and sometimes at a personal interview which he arranged, and then publishing their confidences in a book advertised by him for sale at fifty cents a copy through a lock box in the Washington Post Office. Any Senator or Representative who wants to know just what sort of a person this 'very earnest and devoted gentleman' really is, and how far the impulse of his pursuits is genuinely scientific, may procure from the library of Congress 'Doctor' MacDonald's notorious treatise on 'Girls Who Answer Personals.' Since then the 'Doctor' (he is not a doctor of medicine, of law, of philosophy, or of divinity) has turned himself loose upon the helpless schoolboys and schoolmaidens of the Washington Public Schools. He has measured and tested the boys and girls to the extent to which he was permitted to go. His professed purpose was to obtain with his tape or his testing machines data for scientific generalizations concerning the relations between the physical conformation and moral or intellectual character. He has published statistics and conclusions. The conclusions are the laughing stock of competent scientific authority, but the statistics do really suggest thought, in one particular at least. For example, after consulting 'Doctor' McDonald's 'Girls Who Answer Personals,' let the congressman who desires to vote intelligently and properly on Senate Bill 6,032 procure a copy of his 'Experimental Study of Children, Including Anthropometrical and Psycho-Physical Measurement of Washington School Children.' This was published at the expense of the government as a public document. Amid its worthless conclusions and heterogeneous statistics, the one fact that stands forth conspicuously is the propensity of the 'Doctor' to exercise his anthropometric energy and psycho-physical curiosity upon girls rather than boys, and especially upon girls of sixteen or over, rather than upon boys of sixteen or over. In a partly similar investigation conducted several years ago by a real doctor of medicine (Dr. H. P. Bowditch) for the Boston Board of Health, the number of children measured and examined was 24,626, of whom 13,722 were boys, while only 10,904 were girls. 'Doctor' McDonald was more interested in the cases of the Girls than in the cases of the Boys, in the proportion of 8,520 girls to 7,953 boys; and the increase of his interest as the age of the girls increased in shown very significantly and somewhat unpleasantly in these tables, summarizing the results of his activity in the matter of 'psycho-physical' measurements:

| Boys Examined. | | Girls Examined. | |
|---|---|---|---|
| Age. | Number. | Age. | Number. |
| 6 | 147 | 6 | 131 |
| 7 | 533 | 7 | 508 |
| 8 | 787 | 8 | 754 |
| 9 | 878 | 9 | 883 |
| 10 | 930 | 10 | 939 |
| 11 | 862 | 11 | 931 |
| 12 | 986 | 12 | 876 |
| 13 | 926 | 13 | 966 |
| 14 | 784 | 14 | 833 |
| 15 | 524 | 15 | 655 |
| 16 and over | 592 | 16 and over | 1,044 |
| Total | 7,953 | Total | 8,520 |

The table we print next is our own, and not 'Doctor' McDonald's although its figures are derived from his:

Boys under 14 examined......................................6,049
Girls under 14 examined.....................................5,988
Boys of 14 and over examined...............................1,904
Girls of 14 and over examined...............................2,532

"We observe that the text of the bill which this indefatigable measurer wants Congress to pass in the interest of 'patho-social science' provides expressly that he shall continue his investigation in 'hospitals and schools'; his alleged purpose being that 'the causes of social evils shall be sought out with a view to lessening or preventing them.' Look sharp after the 'Doctor' McDonald bill until the very end of the session."

Argued before JENKS, HOOKER, RICH, MILLER, and GAY-NOR, JJ.

Wales F. Severance, for appellant.

Franklin Bartlett, for respondent.

JENKS, J. The plaintiff alleges that he graduated from the University of Rochester and from the Union Theological Seminary, and that thereafter, in this country and in Europe, he was a university student of medical subjects, especially of medico-legal and criminological nature; that he served the government at Washington as a clerk, under the title of "Specialist in Education as a Preventive of Pauperism and Crime." He further alleges that he is widely and favorably known here, in Canada, and in Europe, both as a student of criminology and a writer of various publications on that and kindred subjects. This article charges that the plaintiff, who it states is not a doctor, "intrapped" young girls and married women into disclosing their delicate confidences (and it is not even stated that this information was gained primarily to aid or to treat these women), and then published them in a book, which he hawked for sale by advertisements assuring secret delivery; in other words, that the plaintiff gained confidences of women, and compiled and offered to sell them, not in the interest of scientific information or good morals, but for money, in a way that would attract those of morbid and unclean minds. If the charge is true, the plaintiff did a vile thing. The rest of the article is in form of imputations, based upon the plaintiff's report in a public document of his professional work. The fact that the article states that the statistics suggest a particular thought, but neither makes a direct charge nor asserts that but one conclusion is possible, does not afford immunity to the defendant. Sanderson v. Caldwell, 45 N. Y. 398, 6 Am. Rep. 105; Odgers on Libel and Slander, 134; Rundell v. Butler, 7 Barb. 260. It is clear enough that the article states that the statistics justify the conclusion that the plaintiff in his professional work applies his testing machine and his tape more frequently to girls than to boys because of the sex of the former, and it is almost unnecessary to say that the tape measurements at least indicate manual contact. The "thought" is more clearly indicated by the statement that the propensity increases when the girls and boys are 16 years of age and over, and by the comparison made in the relative number of boys and girls examined by Dr. Bowditch. The article may be construed as an imputation of indecent and lascivious conduct toward young girls under the cloak of professional investigation.

Upon demurrer we cannot hold that the article is within the purview of fair criticism, in that it is confined to attack upon the work of the plaintiff, and does not brand the workman as an object for public contempt, scorn, and obloquy. Triggs v. Sun Printing & Pub. Ass'n, 179 N. Y. 144, 154, 71 N. E. 739, 66 L. R. A. 612, 103 Am. St. Rep. 841; Whistler v. Ruskin, cited in Odgers on Libel and Slander, p. 35; Newell on Libel and Slander, 557. Ordinarily, such a question is for the jury (Triggs v. Sun Printing & Pub. Ass'n, supra), and we think that it is in this case.

The other points raised by the learned and able counsel for the appellant are discussed in the opinion in McDonald v. Sun Printing & Publishing Association (handed down herewith) ·98 N. Y. Supp. 116.

The interlocutory judgment is reversed, with costs, and the demurrer is overruled, with costs. All concur.