CURTIS B. DALL, Respondent, v. TIME, INCORPORATED, Appellant.

First Department, December 17, 1937.

*Bruce Bromley* of counsel [*Samuel B. Stewart, Jr.,* with him on the brief; *Cravath, deGersdorff, Swaine & Wood,* attorneys], for the appellant.

*Caruthers Ewing,* for the respondent.

DORE, J. Plaintiff sued upon the following allegedly libelous publication in defendant's weekly news-magazine *Time:*

" FOREIGN NEWS

" FRANCE

" Son-in-Law

" ' Yesterday Curtis B. Dall, son-in-law of President Roosevelt, shot himself in the White House in the presence of his estranged wife and Mrs. Roosevelt. He died later in the day.' "

The above statements were in quotation marks. Immediately thereafter was the following, which was not quoted: " If such an event were so briefly reported in the U. S. Press, neither readers nor publishers would be satisfied. Yet almost an exact parallel of that tragedy occurred in the Hotel Continental apartment of Premier Gaston Doumergue last week. Mention was limited to a few slender paragraphs in New York newspapers and a close-mouthed silence on the part of French officialdom."

There then followed another paragraph, also not quoted, which gave details of the suicide of one Enzo de Bonze, son-in-law of the French Prime Minister, Gaston Doumergue, in the presence of the Prime Minister's wife.

As a part of plaintiff's case it was shown that plaintiff had married the daughter of the Honorable Franklin D. Roosevelt in 1926; that at the time of the publication plaintiff was a member of a large commodity and stock brokerage organization having connections in many places throughout the United States, and traveled a great deal for his partnership; that when the article appeared he was very much upset because of his partners as the rumor circulated that he had committed suicide; that a great many people called him and his office to inquire whether it was a fact that he had committed suicide and thereby caused his partners and himself great

embarrassment and indirectly brought attention to his firm as to a possible financial condition therein. Plaintiff also contended that the publication was deliberately malicious and adduced proof of other references to him in other issues of defendant's magazine from which malicious intent was, plaintiff claimed, clearly inferable. Plaintiff further showed that in issues of *Time* subsequent to the alleged libel, defendant had published letters from its own readers about the article sued on indicating that such readers understood the article to mean what was stated in the first paragraph in quotation marks, namely, that the plaintiff had in fact committed suicide. The letters were admitted on an issue of credibility.

At the trial the publication was proved and conceded. No defense of truth as a justification or of privilege was asserted. The defense was that the facts about the suicide of the son-in-law of the French Prime Minister were true; that the purely imaginary and supposed parallel tragedy of suicide by the son-in-law of the President of the United States set forth in quotation marks in the first paragraph of the article was published without malice solely for the purpose of comparison and to give point to the story that followed; and that defendant did not mean and could not reasonably have been understood to mean that plaintiff was actually guilty of self-murder or that any of the facts in connection with such imaginary crime were suppressed through official interference with publicity. Defendant claimed that the use of hypothetical comparisons to make clear the significance of news was a journalistic device very familiar to its readers, and offered illustrations from other issues of *Time.* The managing editor testified that the part of the article in quotation marks was not really a quotation, but what he termed " the imaginary mind of *Time,* but not the serious reporting mind of *Time.*" He called the first paragraph a " Dutch lead," and defined that: " to get his [the reader's] attention with a startling statement which may or may not be true, but to get his attention and then carry him on into the story and tell him what you have to tell him."

At the close of the testimony the case was submitted to the jury in a charge that left the interpretation of the article to the jury as an issue of fact. After the jury had been deliberating for over an hour the court received and answered a communication from the jury as follows:

" The Court: The Court is in receipt of the following communication from the jury:

" ' If it is found that the average reader did not believe that Dall committed suicide after reading the article, is there to be any further

deliberation even though it is believed that Dall might have been damaged? '

" I will answer that in this way, gentlemen: If you determine, applying the tests that I indicated to you and the rules of law, that a reader of ordinary intelligence reading the entire article sued on would understand that no real suicide of the plaintiff Dall was being reported and would understand that the statement about the plaintiff was only imaginary and used for the purpose of illustrating the significance of the suicide of Enzo de Bonze, then your verdict should be for the defendant. You may retire, gentlemen."

To this charge plaintiff had an exception.

The jury retired and in a very short time brought in a verdict for defendant, which the trial court promptly set aside as " against the overwhelming weight of the credible evidence." The court also stated: " The plaintiff clearly established a deliberate libel. To allow this verdict to stand would be a travesty on justice, and I have no hesitancy in setting it aside." This ruling, defendant claims, constituted reversible error.

Any written or printed article published of and concerning a person without lawful justification or excuse and tending to expose him to public contempt, scorn, obloquy, ridicule, shame or disgrace, or tending to induce an evil opinion of him in the minds of right-thinking persons, or injure him in his profession, occupation or trade, is libelous and actionable, whatever the intention of the writer may have been. (*Morey* v. *Morning Journal Assn.*, 123 N. Y. 207; *Bennet* v. *Commercial Advertiser Assn.*, 230 id. 125; *Sydney* v. *Macfadden Newspaper Publishing Corp.*, 242 id. 208, 211, 212; Odgers, Libel and Slander [6th ed.], pp. 16, 17.) The words need not necessarily impute actual disgraceful conduct to the plaintiff; it is sufficient if they render him contemptible and ridiculous. (*Morrison* v. *Smith*, 177 N. Y. 366, 370; Newell, Slander and Libel [4th ed.], p. 9; Odgers, *op. cit.*, p. 16; *Burton* v. *Crowell Pub. Co.*, 82 F. [2d] 154 [C. C. A. 2d Circ.].)

In *Sydney* v. *Macfadden Newspaper Publishing Corp.* (*supra*) the Court of Appeals held: " A publication is libelous *per se* where its tendency is to disgrace the plaintiff and bring him into ridicule and contempt."

In *Morey* v. *Morning Journal Assn.* (*supra*), EARL, J., said: " There can be no doubt that the publication is libelous *per se*. Its tendency was to disgrace the plaintiff and bring him into ridicule and contempt."

In *Triggs* v. *Sun Printing & Publishing Assn.* (179 N. Y. 144, 155), where the words published were alleged to have been written

merely in jest, the court said: " If, however, they can be regarded as having been published as a jest, then it should be said that however desirable it may be that the readers of and the writers for the public prints shall be amused, it is manifest that neither such readers nor writers should be furnished such amusement at the expense of the reputation or business of another. In the language of JOY, C. B.: ' The principle is clear that a person shall not be allowed to murder another's reputation in jest;' or, in the words of SMITH, B., in the same case: ' If a man in jest conveys a serious imputation, he jests at his peril.' (*Donoghue* v. *Hayes*, [1831] Hayes', Irish Exchequer, 265, 266.) "

In *Corrigan* v. *Bobbs-Merrill Co.* (228 N. Y. 58, 64, 65) the Court of Appeals, after referring to works of fiction which " depict as imaginary " events drawn or distorted from real life, stated: " Reputations may not be traduced with impunity, whether under the literary forms of a work of fiction, or in jest (*Triggs* v. *Sun Printing & Pub. Assn.*, 179 N. Y. 144), or by inadvertence (*Moore* v. *Francis*, 121 N. Y. 199, 207), or by the use of words with a double meaning. (*Morrison* v. *Smith*, 177 N. Y. 366; *First Nat. Bank of Waverly* v. *Winters*, 225 N. Y. 47, 50.) "

The same rule was emphasized by this court in *Snyder* v. *New York Press Co., Ltd.* (137 App. Div. 291): " If newspapers see fit to give their readers fiction as news, they do so at their peril. Such an article should not be held harmless, unless in the language of Judge MARTIN in the *Triggs Case* [179 N. Y. 144], it is ' perfectly manifest ' that it is."

Read in the light of the foregoing rules of law, the article published by the defendant concerning the plaintiff is libelous *per se,* and the jury should have been so instructed. It necessarily tended to hold plaintiff up to public shame, contempt and ridicule and injure him in his reputation. The first paragraph of the article in plain and unambiguous language charged plaintiff with the commission of an odious act, self-murder, under circumstances exceptionally revolting and evincing a depraved disregard of human decency. The falsity of that statement was conceded; indeed, it was in effect relied on as part of the defense in that the statement was claimed to be obviously fictitious, a mere figment of the writer's imagination, having no basis in fact, and used merely to illustrate a foreign press policy on another tragedy in which the suicide was actual. Charging a named person with degrading, infamous or criminal acts in what the context later shows to be a fictitious narrative may, nevertheless, be libelous and actionable if the result is to expose such person to public shame or ridicule or injure him in his reputa-

tion, trade or profession. This is merely an application of the fundamental rule that lies at the basis of the whole law of libel. A person may be exposed to public scorn and obloquy by indirect and adroit methods as well as by crude and direct accusations. The effect of the language and not its form is the criterion by which to determine the actionable quality of the words used. (36 C. J. 1153.) If publishers desire to use the names of living persons by way of example or analogy of infamous acts and degrading crimes merely to arrest their readers' attention, they do so at their peril.

If defendant's contention on this appeal were sound, defendant or any other publisher in successive issues of a magazine may charge designated persons with one degraded, immoral, infamous or criminal act after another until every category of crime and indecency is exhausted, provided only in the context of each article the publisher sufficiently suggests to persons of average intelligence that the named person was thus publicly used only for purposes of illustration or analogy and to startle readers into attention. Such contention is obviously without merit.

For the reasons indicated, the jury's verdict was properly set aside and a new trial ordered. The issues for the jury on such trial relate solely to damages.

Affirmance without opinion of prior orders made on motions addressed to the pleadings herein was not a ruling that this court adopted the reasoning or the language of the Special Term, but only its conclusion that the case was not to be disposed of on the pleadings but must await trial. (*Rogers* v. *Decker*, 131 N. Y. 490, 493; *Scott & Co., Inc.*, v. *Scott*, 186 App. Div. 518, 526; *Erie R. R. Co.* v. *International R. Co.*, 209 id. 380, 384; affd., 239 N. Y. 598; 5 C. J. S. 1340, Appeal and Error, § 1857.)

The order appealed from, setting aside the verdict of the jury and directing a new trial, should be affirmed, with costs.

MARTIN, P. J., GLENNON and CALLAHAN, JJ., concur; UNTERMYER, J., concurs in result.

Order unanimously affirmed, with costs and disbursements.