MAURICE FRANK, Respondent-Appellant, v NATIONAL BROAD-CASTING COMPANY, INC., et al., Appellants-Respondents, et al., Defendants.

Second Department, September 29, 1986

## APPEARANCES OF COUNSEL

*Cahill Gordon & Reindel (Dean Ringel* and *Paula A. Franzese* of counsel), and *Sandra S. Baron* and *Roberta R. Brackman* for appellants-respondents. (One brief filed.)

*Schwarzfeld, Ganfer & Shore (Neal Schwarzfeld* of counsel), for respondent-appellant.

## OPINION OF THE COURT

KOOPER, J.

We have occasion today to address the issue of when humor or jest at the expense of an identifiable private person becomes defamation. It is an issue that since the turn of the century has arisen but rarely in New York's appellate courts,[1] and never at all with respect to the medium of television. The principal question in this case is whether the plaintiff's amended complaint against the producers and broadcaster of the late night comedy program "Saturday Night Live" states a cause of action in defamation.

The facts, which are not disputed, are fairly simple. The plaintiff, Maurice Frank, a resident of Westchester County, is described in his amended complaint as being "engaged in business as an accountant, tax consultant and financial planner". The defendants Richard Ebersol and Lorne Michaels are the producers of the late night television comedy program "Saturday Night Live". Saturday Night Live (hereinafter SNL) is broadcast weekly throughout New York and the

---

1. The single notable exception is *Salomone v MacMillan Pub. Co.* (77 AD2d 501, 502, *revg* 97 Misc 2d 346). In that case, the court dismissed the complaint solely on the ground that the plaintiff had "suffered no damages that are compensable in law". In *Dauer & Fittipaldi v Twenty First Century Communications* (43 AD2d 178), it was determined that the humorous article was not about the plaintiff corporation or its business.

United States by the defendant National Broadcasting Company, Inc. (hereinafter NBC).[2]

The plaintiff's complaint concerns an SNL broadcast initially aired nationwide on April 14, 1984, the day before the general deadline for the filing of 1983 income tax returns. The program that evening included a segment known as the "Saturday Night News", the name of which implies a parody of standard, televised news broadcasts. It is a skit contained within the "Saturday Night News" which is the subject of the instant defamation suit.

The plaintiff refers to the objectionable skit as the "Fast Frank Feature". In the skit a performer was introduced to the audience as a tax consultant with the same name as the plaintiff, Maurice Frank. The performer allegedly bore a "noticeable physical resemblance" to the plaintiff. This character then gave purported tax advice which the plaintiff described in his complaint as "ludicrously inappropriate". Specifically, the complaint recites the following monologue as defamatory:

"Thank you. Hello. Look at your calendar. It's April 14th. Your taxes are due tomorrow. You could wind up with your assets in a sling. So listen closely. Here are some write-offs you probably aren't familiar with—courtesy of 'Fast Frank'. Got a houseplant? A Ficus, a Coleus, a Boston Fern—doesn't matter. If you love it and take care of it—claim it as a dependent.

"Got a horrible acne? . . . use a lotta Clearasil . . . that's an Oil-Depletion Allowance. You say your wife won't sleep with you? You got withholding tax coming back. If she walks out on you—you *lose* a dependent. *But* . . . it's a home improvement—write it off.

"Should you happen, while filling out your tax form, to get a paper *cut*—thank your lucky stars—that's a medical expense *and* a disability. Got a rotten tomato in your frige? Frost ruined your crops—that's a farm loss. Your tree gets Dutch Elm Disease . . . Sick leave—take a deduction. Did you take a trip to the bathroom tonight? If you *took* a trip . . . and you did *business*—you can write it off. Wait, there's more. Did you cry at 'Terms of Endearment?' That's a *moving*

---

2. The fourth defendant named in the complaint, Tim Kazurinsky, was, at all pertinent times, a performer and a writer for SNL. It does not appear that he was ever served in this action.

expense. A urologist who's married to another urologist can file a joint return.

"Got a piece of popcorn stuck between your teeth? . . . Or a sister who drools on her shoes? . . . You got money comin' back—and I can get it for you *fast,* because I'm Fast Frank. Call me. I have hundreds of trained relatives waiting to take your call. At fast Frank's, we guarantee your *refund* will be greater than what you *earned*".

In June 1984, the plaintiff's attorney wrote to the defendant Ebersol requesting both a public apology and compensation. It appears, however, that only a private, written apology was offered. Thereafter, in August 1984, the April 14, 1984 SNL program, including the "Fast Frank Feature", was rebroadcast nationwide.

The plaintiff commenced the instant action in November 1984 and served an amended complaint in March 1985. The first two causes of action in his amended complaint sought damages for defamation as a result of the two broadcasts of the "Fast Frank Feature". As the alleged defamation was broadcast by television, it is therefore classified as a libel *(see, Matherson v Marchello,* 100 AD2d 233, 239). The plaintiff, however, did not plead special damages and thus is required to establish that the allegedly defamatory statements constituted libel per se. He must prove that the statements tended to expose him "to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society" *(Sydney v Macfadden Newspaper Pub. Corp.,* 242 NY 208, 211-212; *Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 379, *cert denied* 434 US 969; *Matherson v Marchello, supra,* at p 236).

██ ██ Additionally, a third cause of action was directed solely against the defendant NBC. In it the plaintiff alleged that the use of his name in the two broadcasts of the "Fast Frank Feature" violated Civil Rights Law §§ 50 and 51. The defendants did not submit an answer, but instead moved to dismiss on the ground that the complaint failed to state a cause of action upon which relief could be granted *(see,* CPLR 3211 [a] [7]). Special Term granted that motion with respect to the purported claim under the Civil Rights Law, but permitted the defamation causes of action to stand. We find that the complaint must be dismissed in its entirety.

██ On a motion to dismiss pursuant to CPLR 3211 (a) (7) the

court must give the allegations of the complaint, as supplemented by any additional material submitted by the plaintiff, "their most favorable intendment" *(Arrington v New York Times Co.,* 55 NY2d 433, 442, *mot for reh denied* 57 NY2d 669, *cert denied* 459 US 1146). Even under that liberal standard, it is clear that the plaintiff has no claim under Civil Rights Law §§ 50 and 51. Those provisions permit the recovery of damages for invasion of privacy when one's name or photograph, etc., is used without permission for advertising or trade purposes. As nothing in this record in any way suggests that the plaintiff's name has been so used, the third cause of action of the amended complaint was properly dismissed.

We turn, then, to the plaintiff's allegations of defamation. Giving these pleadings every fair inference, it must be assumed, for purposes of this motion, that the defendants did indeed intend to portray the plaintiff Maurice Frank in their "Fast Frank Feature". But this assumption alone is not sufficient to sustain the complaint. Rather, the court must determine, in the first instance, whether the words complained of are "reasonably susceptible of a defamatory connotation" *(James v Gannett Co.,* 40 NY2d 415, 419; *see, Aronson v Wiersma,* 65 NY2d 592, 593; *Tracy v Newsday, Inc.,* 5 NY2d 134, 136). Once that determination is made, it is for the jury to determine whether or not the defamatory sense was the sense in which the average person would be likely to understand the challenged statements *(see, Mencher v Chesley,* 297 NY 94, 100; *James v Gannett Co., supra; Silsdorf v Levine,* 59 NY2d 8, 12-13, *cert denied* 464 US 831). The converse is also true: the complaint in a defamation action cannot be dismissed unless the court determines that the contested language is incapable of a defamatory meaning *as a matter of law (see, Matherson v Marchello,* 100 AD2d 233, 240, *supra; see also, Aronson v Wiersma, supra).* Therefore, if the instant action is to be dismissed, we must first find, as a matter of law, that the "Fast Frank Feature" was not susceptible of a defamatory meaning.

In reviewing defamation cases, it is the principal duty of the courts to reconcile the individual's interest in guarding his good name with cherished 1st Amendment considerations. This balancing of interests is evident in the requirement that "actual malice" must be demonstrated before a public official can recover damages in defamation, a stringent standard necessitated by the "profound national commitment" to "uninhibited, robust and wide-open" debate upon public issues *(New*

*York Times Co. v Sullivan,* 376 US 254, 270, 280). In some instances, the protection of the 1st Amendment approaches the absolute: for example, the expression of one's opinion, no matter how pernicious, distasteful or unpopular it may be, is not actionable on the theory that defamation requires falsity, and in this country "there is no such thing as a false idea" *(Gertz v Robert Welch, Inc.,* 418 US 323, 339; *see also, Hammerhead Enters. v Brezenoff,* 707 F2d 33, *cert denied* 464 US 892; *Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 379, *supra).*

The terms "humor and comedy" are not and cannot be synonymous with the term "opinion". As forms of expression, humor and comedy have never been held to be entitled to absolute or categorical 1st Amendment protection *(see, e.g., Triggs v Sun Print. & Pub. Assn.,* 179 NY 144, 155; *Polygram Records v Superior Ct.,* 170 Cal App 3d 543, 216 Cal Rptr 252). Indeed, the danger implicit in affording blanket protection to humor or comedy should be obvious, for surely one's reputation can be as effectively and thoroughly destroyed with ridicule as by any false statement of fact. "The principle is clear that a person shall not be allowed to murder another's reputation in jest" *(Donoghue v Hayes,* 1831 Hayes Exch 265, 266 [Ire]).

But it is equally clear that not every humorous article, comedic routine or antic performance will subject its author or performer to liability for defamation. As Judge Learned Hand once observed, "[i]t is indeed not true that all ridicule * * * or all disagreeable comment * * * is actionable; a man must not be too thin-skinned or a self-important prig" *(Burton v Crowell Pub. Co.,* 82 F2d 154, 155). It is settled that language which can be construed only as "rhetorical hyperbole" will not give rise to a claim for defamation *(Greenbelt Pub. Assn. v Bresler,* 398 US 6, 14; *see also, Pring v Penthouse Intl.,* 695 F2d 438, *cert denied* 462 US 1132). Frequently, too, courts, including those of this State, have rejected claims of damages for defamation where the allegedly defamatory statements were patently humorous, devoid of serious meaning or intent and impossible of being reasonably understood otherwise.

The principal factors distinguishing humorous remarks that are defamatory from those that are not appear to be whether the statements were intended to injure as well as amuse and whether they give rise to an impression that they are true. This is the standard that was established in New York in *Triggs v Sun Print. & Pub. Assn.* (179 NY 144, *supra).* There,

the defendant published a series of newspaper articles concerning the plaintiff, a professor at the University of Chicago. In each of the articles, the plaintiff was portrayed as egotistical in the extreme, a man who believed, among other things, that his own brand of colloquial language and slang would be a vast improvement upon Shakespeare. The articles also cast aspersion on Triggs' patriotism; told how he had taken " 'a year of solemn consultation' " before naming his new son; and referred to Triggs as "the god", who was "born great, discovered himself early and has a just appreciation of the value of this discovery". With thinly veiled contempt, the articles closed, stating that it had been one of the pleasures of life to introduce people to the "shrine" of the plaintiff, a "true museum piece" *(Triggs v Sun Print. & Pub. Assn., supra,* at pp 145, 147). The defendant's argument that no cause of action had been stated because the allegedly offending articles had been published in jest was rejected. First, the court found that the articles had been "necessarily calculated, to injure the plaintiff's reputation and to expose him to public contempt, ridicule or shame" *(Triggs v Sun Print. & Pub. Assn., supra,* at p 154). It continued: "It is, perhaps, possible that the defendant published the articles in question as a jest, yet they do not disclose that, but are a scathing denunciation, ridiculing the plaintiff. If, however they can be regarded as having been published as a jest, then it should be said that however desirable it may be that the readers of and the writers for the public prints shall be amused, it is manifest that neither such readers nor writers should be furnished such amusement at the expense of the reputation or business of another * * * We are of the opinion that *one assaulting the reputation or business of another in a public newspaper cannot justify it upon the ground that it was a mere jest, unless it is perfectly manifest from the language employed that it could in no respect be regarded as an attack upon the reputation or business of the person to whom it related"* *(Triggs v Sun Print. & Pub. Assn., supra,* at p 155; emphasis added; *see also, McFadden v Morning Journal Assn.,* 28 App Div 508, 516; *Goudy v Dayton Newspapers,* 14 Ohio App 2d 207, 237 NE2d 909; *Powers v Durgin-Snow Pub. Co.,* 154 Me 108, 144 A2d 294).

*Lamberti v Sun Print. & Pub. Assn.* (111 App Div 437), provides a perfect counterpoint to *Triggs (supra).* In that case, an article was published describing how the plaintiff had fallen victim to a practical joke; a mark of a black hand had been placed on his back. The plaintiff sought damages for

defamation on the ground that the article. tended to connect him with the notorious "Black Hand Society" *(Lamberti v Sun Print. & Pub. Assn., supra,* at p 439). However, the court found that no "fair-minded" person could so construe the article, but would find it an account of a joke and "published to provoke laughter" *(supra,* at p 440). The court further stated: "Of course the mere fact that the print was a jest does not put the defendant out of peril. Ridicule may ruin a reputation or a business. On the other hand, although there is more or less contempt in the laughter that ridicule excites * * * it may be merely 'sportive or thoughtless', and so as to be distinguished from derision * * * While the public press cannot with impunity ruin or affect a man's fair name or his affairs under the guise of a joke or jest, on the other hand it need not be debarred from all humor, even of a personal kind that begets laughter and leaves no sting" *(Lamberti v Sun Print. & Pub. Assn., supra,* at pp 441-442; *see also, Cheatham v Westchester County Publishers,* 20 Misc 2d 770).

How laughter-provoking statements are viewed will depend in large part upon the context in which they are delivered. A recent case in California involved the well-known television personality and comedian Robin Williams. A stand-up comedic routine performed by Mr. Williams at a San Francisco night club was recorded, and the video and audio tapes were thereafter distributed. A video tape of the performance was also carried over the Home Box Office cable television channel. Part of Williams' routine concerned wines, and, in one version, ran as follows: " 'There are White wines, there are Red wines, but why are there no Black wines like: REGE A MOTHERFUCKER. It goes with fish, meat, any damn thing it wants to (Comment from a member of the audience) * * * Thank you Lumpy * * * Isn't it nice, though having someone like Mean Joe Green advertising it—You better buy this or I'll nail your ass to a tree' " *(Polygram Records v Superior Ct.,* 170 Cal App 3d 543, 547, 216 Cal Rptr 252, 254, *supra).* A suit seeking damages for personal defamation, among other things, was thereafter brought by a Mr. David H. Rege, the distributor of "Rege" wines from his San Francisco store, Rege Cellars. The California court examined the statements using a standard similar to our own, to wit, if the offensive words were "not fairly susceptible of a defamatory meaning", the action should be dismissed *(Polygram Records v Superior Ct.,* 170 Cal App 3d, at p 551, 216 Cal Rptr, at p 256). In that case, there was an additional question, not present here, of whether Mr.

Williams had intended to refer to Mr. Rege's product. In dismissing the action, the court relied upon the fact that the statements were unquestionably uttered as part of a comedy routine, and could not be interpreted in any other way. Williams' descriptions of "Rege wine" were "obvious figments of a comic imagination impossible for any sensible person to take seriously" *(Polygram Records v Superior Ct.,* 170 Cal App 3d, at pp 556-557, 216 Cal Rptr, at p 261). The court noted that the audience "knew [Williams] as a comedian, not a wine connoisseur" (170 Cal App 3d, at p 556, 216 Cal Rptr, at p 260), and further noted that: "the statements, which Rege acknowledge[d] were 'made in jest', and which represented a very small part of a rather long comedy performance, were a spoof or parody of advertising practices and wine snobbery * * * For this reason, and in light of the occasion at which the joke was delivered and the attending circumstances, we conclude that, as a matter of law, it was not defamatory. *To hold otherwise would run afoul of the First Amendment and chill the free speech rights of all comedy performers and humorists, to the genuine detriment of our society" (Polygram Records v Superior Ct.,* 170 Cal App 3d, at pp 556-557, 216 Cal Rptr, at pp 260-261; emphasis added).

In the instant case, it can also be asserted without hesitation that no person of any sense could take the so-called tax advice of "Fast Frank" seriously. If anything, the statements here are even more plainly the obvious figments of a comic imagination. A wine might possibly be made dark enough to look black. It might also taste bad, and unquestionably persons who might be regarded as ruffians can and do advertise many products. Income taxes, on the other hand, and persons connected with their collection and even preparation, have been a fertile source of the comic imagination since their adoption. No person who has ever had the dubious pleasure of filling out a 1040 Federal tax form would, in his most extravagant fantasies, believe that he could claim his favorite Boston Fern as a dependent. No person exists who is so gullible as to believe that his acne medication entitles him to an oil-depletion allowance, or that the departure of a spouse from the marital premises—however welcome—may be listed as a deductible "home improvement". Moreover, just as it is inconceivable that anyone hearing Robin Williams' monologue would thereafter avoid Mr. Rege's wines in the belief that they were possessed of an unnatural wine color, or had other peculiar qualities, no one who saw the "Fast Frank Feature"

could believe that the plaintiff was inclined to prepare income tax returns claiming paper cuts as medical expenses.

The contested statements here were so extremely non-sensical and silly that there is no possibility that any person hearing them could take them seriously. Neither were the statements themselves so malicious or vituperative that they would cause a person hearing them to hold the plaintiff in "public contempt, ridicule, aversion or disgrace" *(see, Sydney v Macfadden Newspaper Pub. Corp.,* 242 NY 208, 211-212, *supra; Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 379, *supra; cf. Triggs v Sun Print. & Pub. Assn.,* 179 NY 144, *supra).* We believe that the lunacy of the statements themselves, presented as they were as a small comic part of a larger and obviously comic entertainment program, coupled with the fact that they were neither a malicious nor vicious personal attack, requires a finding that they were not defamatory as a matter of law. Rather, this case involves just that sort of humor which is "of a personal kind that begets laughter and leaves no sting", and it thus cannot form the basis of a lawsuit *(see, Lamberti v Sun Print. & Pub. Assn.,* 111 App Div 437, 442, *supra; see also, Moreno v Time, Inc.,* NYLJ, Mar. 29, 1985, p 12, col 4).

It may often be the case that humorous media or broadcast defamation will be easier to review than printed matter, because the audio and visual aspects of media cases will render them less ambiguous. However, our conclusion here is further supported by those cases involving writings which were found inadequate to support a suit in defamation because they so plainly involved humor, fiction and fantasy, or the bizarre, rather than the vituperative type of jesting exemplified by *Triggs v Sun Print. & Pub. Assn. (supra; see, e.g., Pring v Penthouse Intl.,* 695 F2d 438, *supra; Mullenmeister v Snap-On Tools Corp.,* 587 F Supp 868; *Dauer & Fittipaldi v Twenty First Century Communications,* 43 AD2d 178; *Langworthy v Pulitzer Pub. Co.,* 368 SW2d 385 [Mo]; *Myers v Boston Mag. Co.,* 380 Mass 336, 403 NE2d 376; *Franklin v Friedman,* NYLJ, Sept. 26, 1985, p 6, col 5; *see also,* Restatement [Second] of Torts § 580A).

Certainly, this is an area in which cases will stand or fall on their own peculiar facts. We hold today that in certain situations and under some circumstances, the authors of humorous language will be insulated from liability in defamation cases even where the comic attempt pokes fun at an identifiable individual. The line will be crossed, however, when humor is

used in an attempt to disguise an attempt to injure; at that point a jest no longer merits protection, because it ceases to be a jest. As was the case in *Triggs v Sun Print. & Pub. Assn. (supra),* the defense of humor will not immunize the authors of a malicious or abusive attack upon a plaintiff's character or reputation. In this case, no such malice or abuse can be found in a comic dialogue that offers a Coleus as a tax deductible dependent.

WEINSTEIN, J. P., LAWRENCE and KUNZEMAN, JJ., concur.

Order of the Supreme Court, Westchester County, dated August 19, 1985, modified, on the law, by deleting the provision thereof which denied those branches of the appellants' motion which were to dismiss the first and second causes of action asserted in the plaintiff's amended complaint, and substituting therefor a provision granting those branches of the motion and dismissing those causes of action.

As so modified, order affirmed, insofar as appealed and cross-appealed from, without costs or disbursements.