Quentin **REYNOLDS**, Plaintiff-Appellee,

v.

Westbrook **PEGLER**, The Hearst Corporation and Hearst Consolidated Publications, Inc., Defendants-Appellants.

No. 193, Docket 23329.

United States Court of Appeals Second Circuit.

Argued Feb. 16, 17, 1955.

Decided June 7, 1955.

Phillips, Nizer, Benjamin & Krim, New York City (Louis Nizer, Walter S. Beck, Paul Martinson and Seymour Shainswit, New York City, of counsel), for plaintiff-appellee.

McCauley & Henry, New York City (Milton Pollack, New York City, of counsel), for defendants-appellants.

Before FRANK and MEDINA, Circuit Judges, and BRENNAN, District Judge.

MEDINA, Circuit Judge.

This is a libel action based upon a column of defendant Westbrook Pegler, published on November 29, 1949, by defendant Hearst Consolidated Publications, Inc., owner of the New York Journal-American, a New York City newspaper, which had purchased the article from defendant Hearst Corporation, whose King Features Syndicate division had syndicated the article not only to the Journal-American but to a large number of other publications throughout the United States. As federal jurisdiction is based upon diversity of citizenship, the substantive aspect of the case is governed by New York law. The result of the trial to court and jury was a verdict against all defendants in the sum of $1.00 as compensatory damages and, in addition, punitive damages against Pegler in the sum of $100,000, against Hearst Corporation in the sum of $50,000, and against Hearst Consolidated Publications, Inc. in the sum of $25,000, or smart money of $175,000 in all.

On this appeal defendants claim that the column, or at least the greater part of it, was not defamatory, that no award of punitive damages was warranted, especially against the corporate defendants, that the trial judge ruled as matter of law on certain issues which should have been submitted to the jury, and that defendants did not have a fair trial by reason of a variety of allegedly erroneous rulings said to have been prejudicial to defendants.

The controversy revolves about a book review of Dale Kramer's "The Heywood Broun His Friends Recall," which plaintiff wrote for the New York Herald Tribune Book Review of November 20, 1949, some ten years after Broun's death, and the Pegler column "On Heywood Broun and Quentin Reynolds," published in the November 29, 1949 issue of the Journal-American, above referred to. By counterclaim it was alleged that the book review itself was defamatory of Pegler, and this question was not resolved, as the jury disagreed. In any event, defendants claim that, whether or not based upon excerpts from Kramer's book or upon the book as a whole, the effect of what plaintiff wrote was to assert that Pegler had called Broun a liar, that Broun brooded over this allegedly false charge, and that, although suffering from a cold at the time, Broun couldn't sleep or relax and that he died. This is interpreted as a charge of "moral homicide." The Pegler column is supposed to be a reply to this charge. And the first few paragraphs, with well salted digressions, bear some resemblance to a reply, as they state that "Broun was a notorious liar," that he was "a dirty fighter" and "made his living at controversy," and it is broadly suggested that any notion that Broun sank into despondency and finally died because of anything written about him by Pegler was scarcely credible. There were a few shafts in plaintiff's direction also in these opening paragraphs. The Pegler column then continues: "Reynolds gives some false impressions. So I offer some corrective data."

What follows is a scathing denunciation of plaintiff, which the trial judge held had no conceivable relevancy to any part of plaintiff's review of Kramer's book. Many of the statements concerning plaintiff are plainly defamatory *per se* and the column read as a whole undoubtedly held plaintiff up to "public hatred,

contempt, scorn, obloquy or shame." Triggs v. Sun Printing and Publishing Association, 1904, 179 N.Y. 144, 71 N.E. 739, 742, 66 L.R.A. 612. Thus it is asserted in "As Pegler Sees It," the column in suit, "that Reynolds and his girl friend of the moment were nuding along the public road," that the neighbors might not understand, and if "they saw Reynolds and his wench strolling along together, absolutely raw, they would call the State police;" that "as Reynolds was riding to Heywood's grave with her, he proposed marriage" to the widow; that Reynolds "became one of the great individual profiteers of the war" and "cleaned up $2000 of the ill-gotten loot of the Garsson brothers who, with Congressman Andy May, later were convicted of fraud in war contracts"; that he was a "four-flusher," with "an artificial reputation as a brave war correspondent in the London blitz," one of the " 'let's you and him fight' school of heroes" and that Clare Boothe had "peeled him of his mangy hide and nailed it to the barn door with the yellow streak glaring for the world to see"; and more to the same effect.

Various and sundry explanations are furnished by defendants to support their contention that these charges are innocuous and susceptible of innocent and harmless interpretations, but these explanations are wholly without merit or substance. For example it is suggested that "[P]erfectly honorable people are nudists," and that "[A]t common law, nudism was not a crime." The ride to the grave may have been "years after the date of Broun's death," and the Mosaic Code is cited as imposing "upon a brother the duty of proposing to his dead brother's widow;" and so on.

■ Defendants' counsel in his brief referred to the part about the "yellow streak" as "political gloating in jesting terms," and it may well be that many readers of the column were highly amused by what they read. But this is a curious and unprofitable sort of jesting, as others may not view the humor in the same light. After all, it is elementary that the alleged defamatory article must be read as a whole.

The trial judge presided with his usual meticulous attention to detail, examining with care the authorities cited in support of the many questions of law pressed upon his attention by defendants' experienced counsel. The part of the charge relative to the defamatory character of the column, including the statement, "[T]hat column read in its entirety, I charge you as matter of law, is defamatory," was read to the lawyers for the respective parties in chambers and counsel for defendants agreed that it was unexceptionable.

■ The refusal of the trial judge to charge as requested with reference to paragraphs 12 and 20 of the Pegler column is assigned as prejudicial error. These paragraphs included the statement that plaintiff's "medicine grew too strong even for Collier's" and "a fellow of his politics can do fairly well in Hollywood," also the statement that plaintiff "cleaned up $2000 of the ill-gotten loot of the Garsson brothers." But the innuendoes pleaded in the complaint did not so far exceed the scope of any reasonable interpretation of the language used in the alleged libel as to justify a ruling as matter of law that the innuendoes were unwarranted. The document must be read as a whole, as has already been noted; and the interpretations given in the innuendoes are neither strained nor unnatural. The trial judge properly instructed the jury that if it failed to find that the meanings suggested by plaintiff were conveyed by the words used, then in that event the paragraphs were "out of the case," but, if the language used was found fairly to import and to be understood by the public as having the meanings claimed by plaintiff, the jury should proceed to determine whether or not these paragraphs were defamatory in accordance with the rules given in the general instructions on that subject. These rulings were in accord with well settled New York law. See Sullivan v. Daily Mirror, Inc., 1st Dept. 1931, 232 App.Div. 507, 250 N.Y.S. 420; Mattice

v. Wilcox, 1895, 147 N.Y. 624, 638, 42 N.E. 270; Morrison v. Smith, 1904, 177 N.Y. 366, 369, 69 N.E. 725.

Defendants argue that the judgment must be reversed because the trial judge ruled, as matter of law, that Pegler's article of November 29, 1949 "exceeded the limits of the qualified privilege of reply." The claim is made that, under New York law, this issue is one which must necessarily be submitted to the jury. But defendants evidently misconceive the nature of this defense and fail to distinguish the separate functions of judge and jury in the trial of cases in which the qualified privilege of reply is sought to be invoked as a defense.

By way of background it is well to bear in mind that the defense under consideration is one of "qualified" privilege. Thus, even when applicable, it affords no protection to defendants, unless it is found as a fact that the alleged defamatory matter was published in good faith. Accordingly, where the alleged libel is justified by way of defense as a reply to a prior attack upon the defendant by the plaintiff, the New York cases, assuming them to be applicable, place upon the trial judge the duty to determine *in limine*, as matter of law, whether the content of the alleged libel is pertinent or relevant to the matter contained in the purported initial attack, Guenther v. Ridgway Co., 1st Dept. 1919, 187 App. Div. 593, 176 N.Y.S. 89; Mencher v. Chesley, Sup.Ct.Kings 1948, 193 Misc. 829, 85 N.Y.S.2d 431; Lubliner v. Reinlib, Sup.1946, 62 N.Y.S.2d 212; Lovell Co. v. Houghton, 1889, 116 N.Y. 520, 22 N.E. 1066, 6 L.R.A. 363, and, in this connection, the New York courts have held that the requirement is satisfied if the alleged libel is addressed to the plaintiff's motive in taking the initiative, Collier v. Postum Cereal Co., 1st Dept. 1912, 150 App.Div. 169, 134 N.Y.S. 847. If pertinency is absent, the defense of privilege is unavailable and there is no need for further inquiry. If, however, the court is satisfied that the content of the alleged libel is related to the subject matter of the plaintiff's claimed attack

or to the plaintiff's motive in making the attack, the case is an appropriate one for the invocation of the privilege of reply, and the remaining question is whether the defendant's reply was made in bad faith, in which event the defense fails. It is the function of the jury to pass upon the question of whether or not defendant published the alleged defamatory matter in good faith, as this is a subject on which reasonable men may differ. Ashcroft v. Hammond, 1910, 197 N.Y. 488, 90 N.E. 1117; Fowler v. New York Herald Co., 1st Dept. 1918, 184 App.Div. 608, 172 N.Y.S. 423. The authorities relied upon by defendants in support of their contention are either wholly inapposite or are cases in which the respective courts concluded or assumed that the defendants' utterances were pertinent to the antecedent attack or to plaintiff's motive in making it and where it was held that it was the function of the jury to pass upon defendant's good faith, lack of malice and honest belief that the statements made concerning plaintiff were true.

In this case, it is apparent that Judge Weinfeld concluded that the content of Pegler's article was in no way related to the matter contained in Reynolds' book review or to Reynolds' motive in writing it, but was, rather, a wholly separate personal attack upon Reynolds, inspired perhaps by resentment engendered by the references made to Pegler in the book review. We have examined both writings and are persuaded that this conclusion was justified. Consequently, there was no error in dismissing the alleged defense of privilege.

But it is far from clear that decisions relating to the functions of court and jury in diversity cases are governed by state law. See Pierce Consulting Engineering Co. v. City of Burlington, 2 Cir., 1955, 221 F.2d 607. The impact of Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, on this question is still in doubt. Prior to that case, it was clear that federal law controlled, Herron v. Southern Pacific Co., 1931, 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857,

and the better view would seem to be that no change was wrought by the Erie decision. See State of Washington v. United States, 9 Cir., 1954, 214 F.2d 33, 40; Ettelson v. Metropolitan Life Ins. Co., 3 Cir., 1943, 137 F.2d 62, 64–65, certiorari denied 1943, 320 U.S. 777, 64 S. Ct. 92, 88 L.Ed. 467; Diederich v. American News Co., 10 Cir., 1942, 128 F.2d 144; 5 Moore, Federal Practice (2nd Ed.) 95–104. Applying federal law, we are of the view that the content of Pegler's column is so patently unrelated to the subject matter of the book review as to compel the conclusion that the trial judge would have been remiss in his duty had he submitted this issue to the jury.

On the subject of the assessment of punitive damages defendants make a number of points which will be considered *seriatim.*

 As the finding of compensatory damages was in the nominal sum of $1.00, defendants insist that under New York law there can be no award of punitive damages. But we have already held otherwise in Stevenson v. Hearst Consol. Publications, Inc., 2 Cir., 1954, 214 F.2d 902, 911. Moreover, in the absence of some indication of passion or prejudice, the amount of punitive damages to be awarded is an issue peculiarly within the province of the jury to decide. It is not our function to calculate what any or all of the defendants should be required to pay by way of punishment and in order to deter them from repeating the offense, but only to review the rulings by the trial judge, which are said to constitute reversible error. As he applied the proper standards in passing upon the motion to set aside the verdict and for a new trial, we cannot find any abuse of discretion, and we should be required to reach the same conclusion, even if we thought the verdict excessive. See Stevenson v. Hearst Consol. Publications, Inc., supra.

 The claim that the evidence was insufficient to warrant the assessment of punitive damages has little to support it. As to defendant Pegler, the substantial and varied proofs of malice and ill-will are such as to make it quite unnecessary to collate them, except in so far as they may be included in the matters which will now be discussed, in connection with the contention that there was no basis for an assessment of punitive damages against the two corporate defendants.

 The mere fact that there was no proof of personal ill-will or animosity on the part of any of the corporate executives toward plaintiff does not preclude an award of punitive damages. Malice may be inferred from the very violence and vituperation apparent upon the face of the libel itself, especially where, as here, officers or employees of each corporate defendant had full opportunity to and were under a duty to exercise editorial supervision for purposes of revision, but permitted the publication of the column without investigation, delay or any alteration whatever of its contents. The jury may well have found on this evidence a wanton or reckless indifference to plaintiff's rights.

There is always a certain risk involved in the pleading of truth as a defense, since in proper cases and under proper instructions the jury may infer malice from the fact that a defendant repeats the defamatory matter, which is later found to be false. But here answers were served on behalf of each defendant, which not only repeated but elaborated upon the matters set forth in the original defamatory publication; even the tone and characteristics of the pleading are reminiscent of the style of the column in suit, although the answer is said to have been composed by one or more of the lawyers. It will not do to beg off on the plea that there is no proof that any of the corporate officers read this pleading before it was filed in court and that it is unverified and bears only the subscription of counsel. Despite all this, the fact remains that those who composed this answer and caused it to be filed were acting within the scope of their authority and what they did is binding upon defendants.

Because of the wide scope of the alleged defamatory column, and the vigor with which counsel for the respective parties very properly probed into a seemingly endless number of particular incidents which had more or less relevance to the many issues raised by the pleadings, the trial judge was faced with a formidable task of administration of the trial. This duty was performed with commendable patience and thoroughness, and many of the miscellaneous points now urged upon us as ground for reversal of the judgment involved no more than the exercise of judicial discretion so that the trial, which consumed over seven weeks, should not be unduly protracted and the minds of the jurors be kept free from the burden of a mass of confusing testimonial and documentary evidence of conjectural materiality and little probative value.

■ It was particularly important that so much of the evidence as related to the subject of communism, communist sympathizers and so-called leftist organizations be kept within reasonable bounds. After all it is apparent that this was not by any means the major issue in the case; and a mere reading of the column itself and the openings and summations of counsel make this clear beyond cavil. Accordingly, we see no occasion to do more than mention by the way that there was no undue restriction upon the cross-examination of plaintiff on this issue, nor was it prejudicial or in any way improper for the trial judge to interrogate Pegler in chambers for the purpose of making informed and correct rulings on certain disputed matters of evidence.

■ The exclusion of certain letters written by one Thomas E. Harney purporting to link plaintiff with subversive organizations was proper in view of their hearsay character, their lack of probative value in relation to the issues before the court and the prejudicial nature of their contents.

■ The testimony of Bella V. Dodd appears to have been offered primarily for the purpose of establishing plaintiff's reputation among communists and communist sympathizers. Defendants now assert that it was also their intention to offer this testimony to prove the subversive nature of certain organizations with which, they claim, the plaintiff was associated in some way. But there was no proof that the witness was qualified to testify on the subject of plaintiff's reputation and the rulings were in every way proper. See Michelson v. United States, 1948, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168. Moreover, the trial judge indicated his readiness, at all times, to receive competent evidence of plaintiff's reputation.

■ The effort to adduce from this witness statements relative to the nature of certain organizations suffers from the same infirmities as the Harney letters and the trial judge was justified, in the exercise of his discretion, in excluding matter of such doubtful evidentiary value in order to avoid the confusion, delay and prejudice which would, in all probability, have attended its admission. See Utah State Farm Bureau Federation v. National Farmers Union Service Corp., 10 Cir., 1952, 198 F.2d 20, 24–25, 33 A.L. R.2d 1186; United States v. 88 Cases, More or Less, etc., 3 Cir., 1951, 187 F.2d 967, 974–975.

We have carefully examined the other contentions of defendants, some of which were not presented by objection or exception at the trial, and we find no merit in any one of them.

Affirmed.