232 F.2d 5
 Bart McKENNEY and Marie McKenney, individually and as co-partners doing business under the name of McKenney Logging Company, Appellants,
v.
BUFFELEN MANUFACTURING CO., a corporation, Appellee.
Einar GLASER, Dorothy Glaser and McKenney Logging Corporation, a corporation, Appellants,
v.
BUFFELEN MANUFACTURING CO., a corporation, Appellee.
 No. 14188.
 United States Court of Appeals Ninth Circuit.
 February 29, 1956.
 Rehearing Denied March 27, 1956.
 Second Petition for Rehearing Denied April 20, 1956.
 
 Theodore B. Jensen, Dewey H. Palmer, Davis, Jensen & Martin, Portland, Or., for appellants Bart McKenney and Marie McKenney.
 Leo Levenson, S. J. Bischoff, Portland, Or., for appellants Einar Glaser, Dorothy Glaser and McKenney Logging Co.
 Koerner, Young, McColloch & Dezendorf, James C. Dezendorf, James H. Clarke, Portland, Or., for appellee.
 Before HEALY, POPE and CHAMBERS, Circuit Judges.
 CHAMBERS, Circuit Judge.
 
 
 1
 Buffelen Manufacturing Company is a California corporation. It manufactures at Tacoma, Washington, doors for which "shop lumber" is required and other products for which the lumber from "peeler logs" is needed. It will be herein referred to as Buffelen or as the milling company. Buffelen was the plaintiff in the district court in this diversity case. It is appellee here.
 
 
 2
 Operating in the timber of Tillamook County, Oregon, during the years 1948 to 1951 and perhaps many years before was a logging partnership known as McKenney Logging Company. It consisted of Bart McKenney and Einar Glaser together with their respective wives, Marie McKenney and Dorothy Glaser. They will be hereinafter referred to as McKenney & Glaser or as the logging partnership. The McKenneys and Glasers are citizens of Oregon and were among the the defendants in the trial court. The other defendants were Edward M. Buol and J. B. Carr and a Washington corporation called McKenney Logging Corporation. In 1951, Buol, a citizen of Washington, and Carr, a citizen of Oregon, organized and controlled McKenney Logging Corporation. McKenney and Glaser apparently were never stockholders, officers or directors of this company bearing McKenney's name. The two did become, at least on the face of things, substantial creditors of McKenney Logging Corporation. Perhaps clarity may be improved and not confused if McKenney Logging Corporation is hereinafter referred to as the Buol-Carr Corporation.
 
 
 3
 At the root of the happenings here is a contract of January 8, 1948, between Buffelen and McKenney & Glaser. The contract recites past dealings of the parties including the amounts of loans or advancements to McKenney & Glaser by Buffelen. Then it provided that Buffelen had put up the money to acquire or finish acquiring certain timber lands and cutting contracts, and upon payment of the required sum that the title to these rights was taken in the name of Buffelen, the milling company. The contracts had originally been made by McKenney & Glaser. Of principal concern in the action here were the Belding holdings which on the record were in the name of Buffelen. Also subject to the contract were holdings of the partnership to which it is undisputed the partners had retained title.
 
 
 4
 In addition to its plant or plants at Tacoma, Buffelen was just completing a mill at Batterson, Tillamook County, Oregon. This was near the Belding holdings. The Batterson mill was designed to produce lumber of a "sawmill" grade which was lower grade than that required by Buffelen at Tacoma. Somehow the control of "sawmill" lumber gave Buffelen an advantage in acquiring peeler logs and shop lumber from others. Thus, the Batterson mill expanded along a little different line than Buffelen's manufacturing activities at Tacoma.
 
 
 5
 By the contract, the logging partnership was to supply Buffelen with a certain amount of logs, according to its requirements, and was to give the milling company the right of refusal of all of McKenney & Glaser logs cut by them. Subject to one minor variation, Buffelen was to pay for logs at the market price. The investment that Buffelen had in the Belding and other holdings acquired through or with the help of McKenney & Glaser, together with the moneys advanced by Buffelen, was to be repaid on a "stumpage" basis, so much per thousand board feet of logs logged by the logging partnership. Further, it was provided that when Buffelen had regained the sums it had expended for trees in the woods then there should be no stumpage charge. (It was recited seriously that Buffelen had no desire to make money out of logging.) In other words, thereafter Buffelen would pay McKenney and Glaser for lumber standing in the former's name just the same as it would pay for lumber coming off of lands of the logging partnership in which the milling company had no interest. Further, after the Buffelen lands taken in fee were fully logged off, McKenney & Glaser were to have the fee to the lands for a nominal consideration of a dollar.
 
 
 6
 1948, 1949, 1950 and 1951 were busy production years for Buffelen and McKenney & Glaser. During those years, the latter produced and "sold" in logs to the former over 55 million board feet of lumber. Simultaneously, McKenney & Glaser paid Buffelen in installments the amounts they had agreed to pay on a stumpage basis. By the summer of 1951, Buffelen, by the contract, was entitled to no more "stumpage," because all of the sums which Buffelen was to recover from McKenney & Glaser had been recovered by "stumpage." At this point, McKenney & Glaser were in the enviable position of being able to "sell" to Buffelen at the market price Buffelen's own trees (if such they were) after reducing them to logs.
 
 
 7
 For one reason or another, in 1951, Buffelen, no longer having McKenney & Glaser in its debt, and McKenney & Glaser no longer being in Buffelen's debt, each became restive. Buffelen was trying to sell its Batterson mill and McKenney & Glaser wanted to sell out their equipment and all their timber rights, including those in Buffelen's name. Barring McKenney & Glaser was a clause that they could not sell or transfer their contract with Buffelen or any lands or timber rights under the contract without the consent of Buffelen. McKenney & Glaser fell into the hands of one E. R. Errion, a broker, who seems to have led them to the point of no return and into a world of woe.
 
 
 8
 Buol and Carr were prospective purchasers. In the deal that was worked out, McKenney & Glaser transferred their equipment and "holdings" including the contract timber in the name of Buffelen to the Buol-Carr corporation, i. e. the McKenney Logging Corporation. Everything so taken, was pledged back to secure two notes each in the amount of $575,000.00, payable one to McKenney and one to Glaser. Seemingly, there was no cash payment. No written consent, as required by the June 8, 1948, contract, was given by Buffelen to the transaction.
 
 
 9
 Whether Buffelen was willing to accept the Buol-Carr corporation in place of McKenney & Glaser is not clear. Possibly they were for there seems to have been demands for lumber (and even some purchased) from Buol-Carr by Buffelen in the fall of 1951, but generally Buol-Carr refused delivery. Buol-Carr took the position that the Buffelen-McKenney & Glaser contract of June 8, 1948, was a security transaction, that Buffelen had its money back and McKenney & Glaser had been free to sell to anyone without the leave of anyone else. Further, Buol and Carr and their company contended they were bona fide purchasers.
 
 
 10
 The Buol-Carr Company moved into the Belding tract and in two months cut about 5,000,000 feet of logs, removing 2,000,000 feet and selling it to others than Buffelen. The Batterson mill continued to operate generally on other logs purchased in the neighborhood. The other lumber was not wholly sufficient for the mill and much was of poor quality.
 
 
 11
 Buffelen on October 15, 1951, filed this action against the McKenneys, Glasers, Buol and Carr and Buol and Carr's McKenney Logging Corporation. Damages and a restraining order were sought. The damages were asked for loss of profits at the Batterson mill and for trespass to the Belding tract.[1] A trial was held on January 14, 15 and 16, 1952. Before decision, the trial was reopened and continued on December 5, and 6, 1952. Meanwhile, on December 1, 1952, a supplemental complaint was filed asking for damages which had accrued after October 15, 1951.
 
 
 12
 At this point, it should be related that on the first trial all defendants were represented by the same attorneys, one of whom had participated in the transfer or attempted transfer of the equipment and all of the timber from McKenney & Glaser to the Buol-Carr corporation. At the first trial in January, 1952, Buol, Carr and Glaser swore stoutly that Buol and Carr were innocent of knowledge of the June, 1948, contract at all times prior to completion of the transaction. McKenney's testimony seems also to support them. Technically, however, McKenney only testified that he had never told Buol and Carr or anyone representing them about the Buffelen contract.
 
 
 13
 As the months went by without the litigation coming to an end, McKenney obtained a new attorney. And now McKenney was ready to testify freely. Upon the reopening of the case in December, McKenney testified that while he personally hadn't told Buol and Carr about the contract in advance of the transfer, others had done so in his presence; that Buol and Carr before the transfer had each discussed at given places in front of him the contents of the contract. Also, upon the reopening, another witness, R. A. Matott, testified to the actual knowledge of Buol and Carr. With the change of attorneys (the other defendants, including Glaser stuck by the old set of lawyers) McKenney attempted in a cross-claim to rescind the sale to the Buol-Carr corporation. The claim went out on a lack of diversity.
 
 
 14
 At the conclusion of the trials, the district court entered findings, conclusions of law and a judgment, all in favor of Buffelen. It assessed damages for loss of profits at the Batterson Mill in the amount of $118,000 and $50,000 for damages for removal of timber principally from the Belding tract (of record in the name of Buffelen), the latter sum being calculated at the going stumpage rate of $25.00 a thousand board feet for such timber. As against the Buol-Carr (McKenney Logging Corporation) Company the sum of $50,000 was tripled to make $150,000 damages for a wilful trespass under Oregon law. Further, for inducing the breach of the contract, the sum of $118,000 loss of mill profits was also adjudged payable by the Buol-Carr company.
 
 
 15
 Bart McKenney and Marie McKenney have filed one appeal. The Glasers and the Buol-Carr company pursue another. Then three sets of opening briefs come in for the appellants, then three briefs for Buffelen answer the opening briefs, and finally three closing briefs respond to appellee's briefs. After argument, the parties, with permission, have filed additional briefs.
 
 
 16
 The proof of the damages in the amount of $118,000 is attacked as being inadequate, not competent and too weak by various specifications. Other points are directed at the admission and rejection of evidence. Save for one point after examination of the briefs and all of appellant's authorities, this court finds the specifications of error to be without merit and declines to further spread them on the record.
 
 
 17
 By whatever name it may be called, the one point that does seem to have merit is the one pressed by the McKenneys that there is double compensation here, that the sum of $118,000 overlaps the $50,000 found as against McKenneys and Glasers and tripled against the Buol-Carr Company. That is to say, if the Belding lumber (with the $50,000 price tag) along with other lumber had been delivered to Buffelen, the latter's mill would have had a $118,000 profit and nothing for stumpage under the June 1948 contract. The court gives $168,000. Thus Buffelen gets more for not processing the lumber than if it had.
 
 
 18
 Of course, were it not for the odd end result that Buffelen was entitled to no stumpage by the contract in its last stages of performance, in an ordinary case Buffelen would be entitled to be paid in damages for stumpage and for loss of mill profits. This court does not accept the equitable conversion theories propounded by appellants in the teeth of the trial court's findings that the contract of June 8, 1948, was still in force, was not a security transaction, and that Buffelen still owned the Belding tract. One may argue, that Buffelen couldn't have any property in the Belding tract, something that it couldn't sell for the moment or give away and would even have to pay full price to acquire it from McKenney & Glaser for itself.
 
 
 19
 But looked at another way, the United States has had two periods of scarcities and government managed economies in recent years, World War II and the Korean hostilities, were the right to buy from oneself (to use the vernacular) could be about the most valuable thing a person could have — if that assured a source of supply. This court is not convinced that Oregon law would not give a man, in effect, that right — if he wanted to set it up that way.
 
 
 20
 The trial court construed the contract from its four corners and entered an order that it found that the contract was still in force. No serious effort was made to explain it by parol evidence, if such could have been received. Under the usual rule, therefore, this court is in about the same position to construe the contract as the parties. The parties press the cases of Elliott v. Bloyd, 40 Or. 326, 67 P. 202; Belt v. Matson, 120 Or. 313, 252 P. 80, and Seguin v. Maloney-Chambers Lumber Co. 198 Or. 272, 253 P.2d 252, 256 P.2d 514, 35 A. L.R.2d 1412. None appears conclusive. It could be said that all stand for the proposition that the Oregon courts will try to give effect to agreements as parties intended them.
 
 
 21
 It must follow from the trial court's decision that legal title remained in Buffelen to the trees in the Belding tract. Then if the trees were cut by McKenney & Glaser and "sold" to Buffelen, title to the logs never went through McKenney & Glaser. The net result would be that Buffelen paid what eventuated to be a rather high logging charge. Of course if Buffelen refused the logs and they went to others, title necessarily had to go through McKenney & Glaser to the others and no payment was made to Buffelen.
 
 
 22
 The nature of the claim of Buffelen is for a breach of contract which had not been rescinded by Buffelen for the breach. The court found a breach. As set forth in the Restatement of Contracts, Sec. 329, where a right of action for breach exists, compensatory damages will be given for the net amount of the losses and the gains prevented. The loss of mill profits meets this test. But if this contract had been performed by McKenney & Glaser, there would have been no payment by McKenney & Glaser for the timber. Therefore, for the McKenney & Glaser breach there cannot be compensation charged against them for the timber. To permit it, would be to make the claim against McKenney & Glaser half tort and half contract or half rescission and half affirmance. Therefore, $118,000 is all plaintiff is entitled to recover as against McKenney & Glaser. This same result ought to follow even though any of the defendant's theories were adopted as to the true nature of the contract. At least, Buffelen had a right always to a refusal of the production from the Belding lands and even from McKenney & Glaser's own lands.
 
 
 23
 It is in connection with the claim against the Buol-Carr corporation and Buol and Carr that the discussion of the nature of the contract is more important. The claims against them naturally have to sound in tort — trespass to lands and interference with others' contracts. And such claims do not appear mutually inconsistent. The Oregon statute permits triple damages for trespass. Two thirds of the amount is exemplary.
 
 
 24
 The trial court has awarded $268,000 total damages as against the Buol-Carr corporation. This is the same $118,000 loss of mill profits, $50,000 trespass damage computed on the Belding tract at stumpage rates and $100,000 for exemplary damages. If the claim were for trespass alone, surely the award of $150,000 would not be disturbed by an Oregon court. The fact that Buffelen would have received nothing for the timber if it had been removed under the contract, would surely not preclude recovery in tort for the reasonable value thereof for trespass or conversion. One who sues a wrongful taker is not limited in his recovery, for example, because he has a mortgage on the seized property.
 
 
 25
 Examined alone, also the loss of mill profits of $118,000 seems a reasonable damage item for inducing McKenney and Glaser to breach their contract with the results that naturally followed. But added together, the sum of the parts, $118,000 plus $50,000, adds up to too much compensation for Buffelen's actual damage. Specific authority from Oregon has not been found, but there is Oregon authority, inconclusive though it may be here, in this tort case, that the object of compensatory damages is to make one whole. See Title & Trust Co. v. United States Fidelity & Guaranty Co., 138 Or. 467, 1 P.2d 1100, 7 P.2d 805, Hansen v. Oregon-Washington R. & Nav. Co., 97 Or. 190, 188 P. 963, 191 P. 655. This court is impressed by the comment under § 903, Restatement of Torts, which reads as follows: "Where there has been harm only to the pecuniary interests of a person, compensatory damages are designed to place him in a position substantially equivalent in a pecuniary way to that which he would occupy had no tort been committed." It occurs to this court that the Oregon courts in tort cases would follow their pronouncements in contract cases and hold that subordinate rules for the measure of damages must yield to a paramount rule of fair and just compensation. Perhaps this can be inferred from Beisell v. Wood, 182 Or. 66, 185 P.2d 570.
 
 
 26
 Therefore, until better advised, this court holds that after allowing $50,000 for trespass, that sum must be deducted from the loss of mill profits in the amount of $118,000. That would leave due for mill profits lost as against the Buol-Carr corporation the sum of $68,000. However, plaintiff may retain its exemplary item of $100,000 against the Buol-Carr corporation.
 
 
 27
 Of course, plaintiff may only collect a total of $218,000 and of that only $118,000 from McKenney and Glaser.
 
 
 28
 Subject to modifications which the district court will be directed to make in accordance with this opinion the judgment will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 The pre-trial orders agreed to by the parties silently appear to eliminate all claims against Buol and Carr individually. While no order of dismissal was entered in their favor, it would seem that after the first pre-trial order there remained no claim or claims against the two. From that point forward, they would classify as "wild parties," i. e., parties who no longer served any purpose in the case. Under such circumstances, there is little doubt that the court's judgment against the defendants remaining as parties to the issues was a final judgment. See 28 U.S.C.A. § 1291
 
 
 
 29
 POPE, Circuit Judge (concurring in part and dissenting in part).
 
 
 30
 I am in accord with the reasoning in Judge Chambers' opinion by which he arrives at the conclusion that since the Buffelen Company did not actually lose the $50,000 which was added to the judgment against the McKenneys and the Glasers, the judgment against them must be reduced by that amount and limited to the award based on loss of profits. The opinion adequately discloses that the $50,000 trespass or stumpage loss was purely illusory.
 
 
 31
 I am also in accord with what is there stated about the rule of damages that should be applied in determining how much may be recovered for the torts found to have been committed by what is referred to as the Buol-Carr Corporation. I approve his conclusion that this is an occasion for application of the rule of § 903 Restatement of Torts to the effect that the normal recovery for tort is limited to those damages which will compensate the plaintiff for his actual pecuniary loss, and that the award should be designed to place him in a position "substantially equivalent in a pecuniary way to that which he would occupy had no tort been committed." I agree that "the Oregon courts in tort cases would follow their pronouncements in contract cases." I agree that Beisell v. Wood, 182 Or. 66, 185 P.2d 570, appears to support the quoted statement. What the court has done is to say in substance that "as a general rule the measure of damages for an injury to, or loss of, property by a tort is compensation for the actual loss sustained thereby."[1] As the court properly disallows the $50,000 claimed for breach of contract since the only loss was loss of profits, and hence "there cannot be compensation charged * * * for the timber", an Oregon court, as Judge Chambers says, "would follow their pronouncements in contract cases" and reject the same item claimed as damages for tort. As the opinion discloses, there was simply no such loss whether from breach of contract or from tort.
 
 
 32
 Hence the court, in adding up the damages resulting from tort, necessarily rejected and disallowed the $50,000 item. It did this in what seems to me to be a rather odd way, namely, by subtracting the $50,000 from the $118,000 loss of profits. But since we all agree the $118,000 was actually and really the amount of such loss of profits, there is no occasion for subtracting anything therefrom except as a process of disallowing the $50,000 item.
 
 
 33
 However, after arriving at that sound conclusion, the opinion turns up with a wholly unjustified addition of an "exemplary item of $100,000". The Oregon statute, Ore.Rev.Stat. § 105.810, under which treble damages are awarded, provides that whenever a person willfully cuts down timber on the land of another then in an action by the latter for such trespass "if judgment is given for the plaintiff, it shall be given for treble the amount of damages claimed, or assessed for the trespass." The opinion speaks of the $150,000 award for trespass damage as including $100,000 for exemplary damages. It is true that the double and treble part of such an award partakes of the nature of exemplary or punitive damages. The Oregon court has had occasion to refer to it in those terms. Oregon & C. R. Co. v. Jackson, 21 Or. 360, 28 P. 74; Eastman v. Jennings-McRae Logging Co., 69 Or. 1, 138 P. 216; McHargue v. Calchina, 78 Or. 326, 153 P. 99. But, as is evident from an examination of the first and last of the cases just cited, and from the statute itself, the punitive, vindictive or exemplary part of such an award must necessarily bear a precise relationship to the actual damages awarded for the trespass. Cf. Meixner v. Buecksler, 216 Minn. 586, 13 N.W.2d 754, 757: "The language of the statute is clear that treble damages may be awarded only upon an assessment of actual damages." The exemplary items recoverable under such a statute are not like exemplary damages generally. Thus in Reynolds v. Pegler, 2 Cir., 223 F.2d 429, the plaintiff recovered $1.00 actual damages and $175,000 exemplary damages. But under the statute here discussed if the actual damages were $1.00 the limit of plaintiff's recovery would be $3.00. As the opinion shows, here the $50,000 trespass or stumpage award was not real or actual. It follows that since three times nothing is still nothing it is improper to permit any recovery here by way of punitive or exemplary damages. In my view judgment cannot be sustained against any defendant for any amount in excess of $118,000.
 
 
 
 Notes:
 
 
 [1]
 The quoted language is from 25 C.J.S., Damages, § 82, p. 596
 
 
 On Petition for Rehearing
 
 34
 PER CURIAM.
 
 
 35
 Appellants McKenney in their petition for rehearing make two points. The first concerns the damages awarded in the case. The second raises objection to the form of the injunctive relief granted Buffelen in the trial court's judgment. The restraining portion of the judgment reads as follows:
 
 
 36
 "That defendant McKenney Logging Corporation be and it hereby is permanently restrained and enjoined from trespassing on the lands or injuring or cutting any timber covered by the contract, which is Plaintiff's Exhibit 1, and from interfering with or inducing a breach of said contract by defendants Bart McKenney, Marie McKenney, Einar Glaser and Dorothy Glaser;" The attack now made (and for the first time) is that the form is too general and it refers to a document outside the corners of the judgment. Therefore, the injunctive commands do not meet the requirements of Rule 65(d) of the Federal Rules of Procedure, 28 U.S.C.A.
 
 
 37
 The generality of the injunctive commands did not deprive the trial court of jurisdiction.
 
 
 38
 This vice of generality was not mentioned in the trial court when the McKenneys made a motion to amend the judgment. No complaint was made here of this generality when the McKenneys made their specification of errors.
 
 
 39
 The mandate will go down authorizing, but not directing, the trial court to amend the injunctive provisions of the judgment to comply with Rule 65(d), if in its discretion it now finds such a course advisable.
 
 
 40
 Otherwise, the petition of appellants McKenney is denied.