Ariel SHARON, Plaintiff,

v.

TIME, INC., Defendant.

No. 83 Civ. 4660 (ADS).

United States District Court,
S.D. New York.

Nov. 26, 1984.

Shea & Gould, New York City (Milton S. Gould, Bernard D. Fischman, Arnold Forster, Richard M. Goldstein, Adam B. Gilbert, and Andrea B. Feller, New York City, of counsel), for plaintiff.

Cravath, Swaine & Moore, New York City (Thomas D. Barr, Robert S. Rifkind, Paul C. Saunders, Stuart W. Gold, Ronald K. Chen, Kathleen L. Beggs, Israel Leshem, Stephen S. Madsen, Ellen S. Oran and Anne E. Verdon, New York City, of counsel) and Time, Inc., New York City (William M. Guttman, Harry M. Johnston, III, and Robert P. Marshall, Jr., New York City, of counsel), for defendant.

## MEMORANDUM OPINION AND ORDER

SOFAER, District Judge:

The plaintiff, Minister Ariel Sharon, has moved to strike from defendant's witness list the names of several persons whom the defendant, Time, Inc., may wish to call at trial. Defendant has described these witnesses as "experts"; they include scholars, writers, a journalist, a diplomat, and a retired general. Time's response to plaintiff's interrogatories provided no specific information as to how any of these witnesses would testify if called. Instead, Time has set out in general the subjects on which all the witnesses would testify. In essence, these witnesses would testify to such matters as the modern history of Lebanon, Israeli-Lebanese relations, and information about massacres which was available to Minister Sharon. Time's purpose in calling these witnesses is to support its defense of "substantial truth" of the alleged libel by establishing that Sharon's decision to allow the Phalangists to enter the camps represented encouragement or approval of the ensuing massacre:

The experts will testify about the relationships among nations and parties in the Mideast and in particular about the relationships between Israel and its representatives and the Phalangists, other Lebanese factions, the PLO and other Palestinians and the historical and social patterns of "blood revenge" in Arab society and in Lebanon. The expert testimony will show that anyone with as much knowledge of the Mideast and the parties involved as Minister Sharon had could be reasonably certain that, given the chance, the Phalangists would not only avenge the assassination of Bashir Gemayel but that bloodshed of innocents would be the predictable result. Our experts will testify in substance that letting the Phalange into the camps was just like throwing a poisonous snake into a bed. As one writer said:

"For anyone with the slightest understanding of Lebanon, the massacre was a foregone conclusion once the Lebanese Forces were authorized to enter the camps. It was just as natural as cats chasing rats." *J. Randal, Going All the Way, Christian War-*

*lords, Israeli Adventurers, and the War in Lebanon,* Random House 1983, p. 16.

The expert testimony relates directly to the issues of plaintiff's intent and knowledge at the time he permitted the Phalangists to enter the camps. Certainly no one can know for certain what was in Minister Sharon's head. But from this evidence of the type to be elicited from the experts it is at least possible to draw an inference to the ultimate issue; that plaintiff's decision to order the Phalange into the camps, in light of such knowledge, amounted to encouragement or condonation of the massacre at Sabra and Shatilla.

Memorandum of Time Incorporated in Opposition to Plaintiff's Motion in Limine To Strike the Experts From Defendant's Trial Witness List at 3–4 (Oct. 17, 1984) (footnote omitted).

Plaintiff objects to Time's proposed evidence and witnesses on several grounds. Most fundamentally, he claims the evidence is irrelevant, since even if Time proved that plaintiff's actions "amounted to" encouraging or condoning the Phalangists' massacre of noncombatants, such proof would not constitute "substantial truth" of the alleged libel Time actually published. In addition, plaintiff claims that Time's proposed evidence is cumulative to the evidence in the Kahan Commission Report and therefore unnecessary, that the witnesses proposed could not give proper expert testimony, and that the prejudicial effects of the evidence far outweigh its probative value.

Plaintiff is correct in arguing that Time cannot establish "substantial truth" by proving that plaintiff "should" or "must" have known that a massacre would occur. That proposition would be linguistically indistinguishable from, and the moral equivalent of, the Kahan Commission's conclusions. Thus, for example, the Commission found that the danger of acts of slaughter "should have been in the consciousness of every knowledgeable person who was close to this subject, and certainly in the consciousness of the Defense Minister, who

took an active part in everything relating to the war." Report at 68. If Time had stated in its article that Sharon "should" or "must" have known a massacre would occur, its statement would have been protected either as fair comment, neutral reportage, or opinion. *See Sharon v. Time, Inc.,* 599 F.Supp. 538, 554, 555 (1984). If Time's statement is defamatory, it must be because it alleges something more. *See Sharon v. Time, Inc.,* 575 F.Supp. 1162, 1168–72 (1983).

■ At a recent conference, however, Time's counsel made clear that Time's proposed version of substantial truth goes beyond and contradicts the conclusions of the Kahan Commission. The Commission was strongly critical of Minister Sharon's decision to allow the Phalangists to enter Sabra and Shatilla; it found that he "made a grave mistake when he ignored the danger of acts of revenge and bloodshed by the Phalangists against the population in the refugee camps," Report at 69, and that his "blunders" in "not ordering appropriate measures for preventing or reducing the danger of massacre as a condition for the Phalangists' entry into the camps .... constitute[d] the non-fulfillment of a duty with which the Defense Minister was charged," *id.* at 71. But the Commission also concluded that there was no evidence that Minister Sharon had intended that harm befall the noncombatant population and that the Phalangists' acts were not concurred in or assented to by any Israeli official:

> [I]n having the Phalangists enter the camps, no intention existed on the part of anyone who acted on behalf of Israel to harm the non-combatant population, and ... the events that followed did not have the concurrence or assent of anyone from the political or civilian echelon who was active regarding the Phalangists' entry into the camps.

*Id.* at 52. Time's attorneys have now clearly indicated that they intend to prove about Sharon precisely what the Commission found was not true—that he intended to harm noncombatants and concurred in and

assented to the massacre. *See* Trial Tr. at 715–16, 722–24 (Nov. 21, 1984).

Plaintiff claims that even Time's argument that Minister Sharon intended to harm noncombatants fails to amount to a "substantial truth" of the very concrete libel alleged. But Time's argument is sufficiently related to the "sting" or "gist" of the alleged libel to justify its full and fair presentation to the jury. The jury can find that Time's published statement was defamatory only if it finds that Time suggested that plaintiff knew in advance that acts of revenge would occur in Sabra and Shatilla, and that he lied to the Commission in claiming otherwise. Defendant is permitted to prove the substantial truth of this statement by establishing any other proposition that has the same "gist" or "sting" as the original libel, that is, the same effect on the mind of the reader. *Fleckenstein v. Friedman*, 266 N.Y. 19, 23, 193 N.E. 537, 538 (1934); *see Lawlor v. Gallagher Presidents' Report, Inc.*, 394 F.Supp. 721, 730 (S.D.N.Y.1975), *remanded*, 538 F.2d 311 (2d Cir.1976). The gist or sting of the published libel is that, contrary to the Commission's explicit findings, Sharon *did* intend to harm noncombatants by sending the Phalangists into the camps, that he concurred and assented in the events that followed, and that he thereafter lied about his intentions. Time has now made clear that it wishes to prove precisely this gist which, although more explicitly defamatory than Time's original statement, represents the only construction of that statement legally sufficient to justify plaintiff's suit. Furthermore, even if this broadened and more explicit defamation fails technically to fit within a narrow version of the "substantial truth" doctrine, Time would be entitled to prove its present claim for the purpose of mitigating damages. *See Crane v. New York World Telegram Corp.*, 308 N.Y. 470, 479, 126 N.E. 753, 759 (1955). If Time succeeded in establishing its claim that Minister Sharon intended to harm noncombatants and acted to give effect to his intentions, then no award of damages could be tolerated; its argument in the special circumstances of this litigation thus amounts to the practical as well as the moral equivalent of substantial truth. Accordingly, Time must be permitted to present testimony on appropriate subjects to prove this claim.

Plaintiff's claims that the testimony proposed is cumulative, improper, and potentially prejudicial have considerable merit. Excessive exposure to cumulative evidence of the prior history of massacres among Lebanese groups, for example, could unfairly prejudice the jury (because of its inflammatory nature), could confuse the issues and mislead the jury (because those actions were taken without IDF supervision), and could waste time (because the Report contains sufficient evidence on this point and plaintiff has admitted that he knew of the prior massacres). Fed.R.Evid. 403. Time should not attempt to present evidence already in the Report through time-consuming witnesses. It should pick one witness to summarize the points it seeks to emphasize, and should add other witnesses only if they can present noncumulative, admissible evidence concerning Sharon's activities or statements, and only then if plaintiff is unwilling to stipulate to the facts proposed to be proved. The witness or witnesses called by Time will be limited to testifying about historical fact, and may not speculate about plaintiff's subjective state of mind. Counsel must argue to the jury as to what inferences should be drawn from the testimony presented. Evidence that allegedly proves that Sharon is a murderer will tend to be "prejudicial" in the everyday sense of the word. Nevertheless, any proper evidence helpful to Time in establishing its contention will be allowed, as the prejudice caused by proper evidence will not be "unfair." But the grave nature of the allegation against Sharon requires that Time be prevented from using inflammatory and improper hearsay, including other newspaper articles, to establish its claim of substantial truth. Time must be careful to avoid reading inadmissible material to the jury, as almost occurred in connection with *Israel's Lebanon War*, a book by two reporters

that Time wrongly attempted to place before the jury as a "learned treatise." References to articles that are admissible for purposes of proving reputation or actual malice must only occur in proper context, that is, when defendant's line of questioning or argument pertains to these issues, and will be accompanied with proper cautionary instructions from the court.

■ The broad version of substantial truth that Time seeks to establish also raises a question as to who properly bears the burden of proof on the issue. The parties agree, under the circumstances of this case, that a public-figure plaintiff must bear the burden of proving the falsity of the published libel by clear and convincing evidence. *See Cianci v. New Times Publishing Co.*, 639 F.2d 54, 59 (2d Cir.1980); *Buckley v. Littell*, 539 F.2d 882, 889 (2d Cir.1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977). Plaintiff will be required to prove both that he had no conversation with the Gemayels at Bikfaya about the need to avenge the assassination of Bashir, and that no details of such a conversation are present in Appendix B of the Commission Report. Furthermore, plaintiff will also be required to prove that he had no conversation about revenge at any other meeting with the Phalangist leadership after Bashir's assassination and before they entered Sabra and Shatilla, and that Appendix B contains no references to any such conversation.

■ Plaintiff cannot fairly be required, however, to bear the burden of proof on Time's broad claim of substantial truth. This claim has no factual similarity to the story Time printed. The "substantial truth" doctrine arose in the common-law context, where truth was an affirmative defense on which the defendant had the burden of proof. While that allocation of the burden of proof must be reconsidered after *New York Times v. Sullivan* with respect to the truth of the story actually printed, including any minor or insignificant variations on the published story, it need not, and should not, enable a defendant at trial to allege substantially different facts than were printed and thus impose upon a plaintiff the burden of disproving factual statements that were not made. Indeed, in this case Time claims that, when it printed the story at issue, it did not even intend to suggest what it now seeks to prove. In these circumstances, Time must bear the burden of proving its expansive version of substantial truth by a preponderance of the evidence. Finally, in order to prevent confusion, given the many confusing verbal variants by which the issue of substantial truth could be placed before the jury, the parties will be required to argue this matter to the jury in one consistent form which takes as its point of departure the findings in the Commission Report. Thus, Time may attempt to prove that "in having the Phalangists enter the camps," Sharon did have an "intention ... to harm the non-combatant population," and that the events that followed did have Sharon's "concurrence and assent."

\* \* \*

■ Time's strategy concerning substantial truth—to prove in its own defense that plaintiff is a murderer of noncombatants—cannot be treated as simply an alternative argument to justify a verdict in its favor. At the most mundane level, because Time is affirmatively advancing its claim of substantial truth, Time represents that "to the best of [its] knowledge, information and belief formed after reasonable inquiry [its claim] is well grounded in fact ... and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Fed.R.Civ.P. 11. If Time's argument of substantial truth not only fails, but the jury also concludes, by way of special interrogatory, that the contention that Sharon knowingly concurred in and assented to the massacre lacked any substantial basis in the evidence, then the costs, including attorneys' fees, caused by this claim may be imposed upon Time or upon its attorneys. *Id.*

The court is not privy to all the evidence Time has accumulated on this issue. Thus far, Time appears to be relying on the

Report, which is in evidence, and upon some writings by journalists which are inadmissible on the issue of truth. Unless other evidence becomes available, the record could lead a jury to conclude that Time's substantial truth argument was made without any substantial basis or even in bad faith. The jury will no doubt be made aware, as plaintiff has repeatedly noted, that every one of Time's employees had read the Report before the article at issue was published, and that each of them has testified that he or she had no reason to believe that Sharon knew in advance that the massacre would take place. Implicitly, therefore, Time's employees have thus far testified that they do not believe that the Report supports a claim that Sharon intended to harm noncombatants. *See, e.g.,* Halévy Tr. at 669–70, 675; Kelly Tr. at 226–28; Smith Tr. at 448–49; Doyle Tr. at 184; Gonzalez-Alfonso Tr. at 147. The Report in fact contains strong evidence to supports its conclusion that Sharon did not intend to harm noncombatants and did not concur in or assent to the massacre. If this case were being tried without a jury, as Time has sought, the court would entertain Time's present effort to prove substantial truth only if Time represented that it had substantial evidence beyond that contained in the Commission Report.

Time may have even more to lose through the strategy it has adopted than an adverse jury finding on substantial truth, and the costs of litigating the issue. First, its argument on substantial truth could undermine its position on whether the statement at issue was defamatory. The jury may well be unimpressed by the claims of Time's reporters that they did not mean to defame Sharon, when Time's attorneys are simultaneously arguing that Sharon is a murderer largely on the basis of the same evidence its reporters possessed when they wrote the article. Second, Time's arguments on substantial truth could adversely affect its position on the issue of actual malice. The Supreme Court has given Time extraordinary protection. Time is able to assume the posture that it may have made a mistake but that, however negligently or even spitefully its reporters acted, they believed their story was true. This powerful protection, which requires plaintiff to prove Time's actual malice by clear and convincing evidence, is still available to Time. But the credibility of Time's employees as to their state of mind may be affected by what they say—and by what Time's other witnesses say and its lawyers argue—on the substantial truth issue. Instead of arguing simply that Time's reporters are honest people who had nothing defamatory to say about plaintiff, Time apparently intends to present an incongruously ambivalent and aggressive posture, that may in both obvious and subtle ways undermine its credibility: that, although Time's reporters originally had nothing defamatory to say about plaintiff, they have now discovered that he was in fact the murderer they did not mean to say he was. The potential impact of this difference in posture on the actual malice issue cannot be fully anticipated, but it is likely to be great. It is likely to be aggravated, moreover, if Time is ultimately compelled to acknowledge that its original story was incorrect. If such a concession is ever required in the course of its present strategy, Time may have lost the opportunity simply to acknowledge its error and to use that acknowledgement as evidence of a continuing lack of actual malice; instead, it will be acknowledging one error while attempting to prove that the gist or sting of what it claims it never said is nevertheless true. The jury may give less credence to Time's claim of honest error under such circumstances than it would if Time simply conceded its story was wrong and relied on its constitutional defense.

Finally, and perhaps most significantly, Time's argument on "substantial truth"—if it is rejected by the jury—could have a profound impact on the damages potentially recoverable in this case. Plaintiff has no special or pecuniary damages. He claims only damage to his reputation, including the humiliation and loss of stature he has allegedly suffered as a result of Time's story. This claim is sufficient to go to the

jury. But as a member of the Israeli Cabinet with a huge following of supporters, and as a person whose reputation is highly controversial and has been scarred by the Commission Report and other, less respectable commentary, plaintiff faces formidable obstacles to recovering substantial compensatory damages. Time's argument of substantial truth, however, in which it makes the gravest possible charges one can level at a professional soldier, may well lead the jury to give greater credence and weight to plaintiff's claims of reputational injury and personal humiliation than might otherwise be the case. Furthermore, if the jury rejects Time's defenses, Time's efforts to prove substantial truth through inflammatory claims about the plaintiff may lead the jury to award punitive damages, and Time Inc.'s great assets may lead the jury to conclude that only a very substantial award would serve the deterrent purposes intended by the award of punitive damages in New York. *See Goldwater v. Ginzburg,* 414 F.2d 324, 341–42 & n. 29 (2d Cir.1969), *cert. denied,* 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970); *Toomey v. Farley,* 2 N.Y.2d 71, 83, 138 N.E.2d 221, 228, 156 N.Y.S.2d 840, 849 (1956). If these developments occur, Time will have largely brought them upon itself, and may not be able convincingly to blame the law or the jury for its plight.

Time should be aware that its strategy of broadening and making explicit the alleged libel is a tactic that has traditionally been recognized as a possible basis for aggravating damages. The law protects parties to a judicial proceeding from damages caused by all reasonably justifiable, good-faith arguments made in the course of the litigation. *See Ann-Margret v. High Society Magazine, Inc.,* 498 F.Supp. 401, 408 (S.D.N.Y.1980); *The Savage Is Loose Co. v. United Artists Theatre Circuit,* 413 F.Supp. 555, 560–61 (S.D.N.Y.1976); *Schulman v. Anderson Russell Kill & Olick, P.C.,* 117 Misc.2d 162, 166–67, 458 N.Y.S.2d 448, 452–53 (Spec.Term 1982). Here, although Time's substantial truth argument is conceptually defensible, the jury may conclude that Time had so little evidence to support this claim that its assertion unjustifiably aggravated the injury to plaintiff's reputation and feelings. The law of New York—and the common law generally—has long recognized that under appropriate circumstances a recovery in damages for an unjustifiable aggravation of injury to reputation during litigation is appropriate. *See Holmes v. Jones,* 121 N.Y. 461, 466–67, 24 N.E. 701 (1890) (proper for judge to charge jury that if defendant "failed to establish the justification of the libel set up in the answer ... and ... they found it was set up in bad faith they could take that into consideration in estimating the damages to be awarded by them"); *Distin v. Rose,* 69 N.Y. 122, 127–28 (1877) (if jury "believed that [a reiteration of the libel 'in express terms'] was inserted in the answer wantonly or maliciously, and without probable cause for believing it true, they might consider it upon the question of damages"); 35 N.Y.Jur., Libel and Slander § 187, at 105 (1964) (repetition of libel in pleadings, if done in bad faith, may be considered by jury in determining damages).

Indeed, in *Reynolds v. Pegler,* 123 F.Supp. 36, 40 (S.D.N.Y.1954), *aff'd,* 223 F.2d 429 (2d Cir.), *cert. denied,* 350 U.S. 846, 76 S.Ct. 80, 100 L.Ed. 754 (1955), Judge Wienfeld upheld an award of substantial punitive damages due to the defendants "malevolence and ill-will" in part because the defendants' amended answer, filed after plaintiff had denounced the alleged libel as false, "not only repeated but expanded upon the charges. Thus, instead of a retraction, there was a reiteration and broadening of the original charges." In affirming this decision, the Second Circuit explicitly approved Judge Wienfeld's reasoning:

> There is always a certain risk involved in the pleading of truth as a defense, since in proper cases and under proper instructions the jury may infer [common-law] malice from the fact that a defendant repeats the defamatory matter, which is later found to be false. But here answers were served on behalf of each defendant, which not only repeated

**1298**

but elaborated upon the matters set forth in the original defamatory publication; even the tone and characteristics of the pleading are reminiscent of the style of the column in suit. . . .

223 F.2d at 434.

Nothing in the doctrine of *New York Times v. Sullivan* requires that these seldom-used but sound principles be jettisoned. The favorable treatment accorded to the judgments of reporters in their reportorial function provides no support for deferring to an excessively aggressive and hence unnecessarily costly litigation strategy adopted by the press at trial. The press, in short, has no more right than any other litigant—and far less reason in light of its constitutional defenses—to turn a libel litigation into an unlimited war. If Time loses this case, the jury will be asked whether Time had any basis for making its claim of substantial truth and whether the plaintiff's damages were aggravated by the explicit contention at this widely publicized trial that Sharon intentionally authorized the murder of noncombatants.

Plaintiff has argued throughout this litigation that Time's conduct, and now its litigation strategy, is the product of bias in various forms. Apart from the actual malice claim, these contentions have been rejected as a matter of law. Time is a vigorous, critical journal that strives to express its point of view in reporting the weekly news. As far as the existing record indicates, and without commenting on the specific story in dispute, Time is no less and no more in character with respect to the general subjects at issue in this case than it is in its writings on any other subject.

The impetus for Time's decision to expand the issues in this case—and thereby to raise the stakes at risk—appears to stem from the trauma of the libel litigation process itself, rather than from *ad hominem* considerations. While the rule in *New York Times v. Sullivan* has conferred a powerful defense upon the press, it has opened the minds of reporters as well as their newsrooms to unfriendly searches and public scrutiny. *See Herbert v. Lando,* 441 U.S. 153, 169–75, 99 S.Ct. 1635, 1645–48, 60 L.Ed.2d 115 (1979). The "actual malice" discovery process has in this case, as it must in other similar cases, forced Time to cooperate in costly and disruptive proceedings, consuming material and human resources that Time exists to devote to more constructive ends. It has led to the development of a case against Time based in part on revelations made by Time during its own internal scrutiny of a reporter, and in unprivileged but nonetheless private communications among Time personnel. One cannot escape the impression that Time, like other libel defendants who can afford to fight, has concluded that its best defense is to inflict as much damage upon plaintiffs in the litigation process as plaintiffs are able to inflict on Time. This is an untenable and unhealthy situation, but its remedy lies in adjusting the existing law to enhance conciliation and respect for opposing views and human feelings, rather than in heightening conflict and escalating defamatory attacks within the litigation process.

The court has made clear the benefits to Time of a limited litigation strategy that relies on its constitutional defense. In the event that Time becomes convinced its original story was wrong, it will be able to enhance the credibility of its claim of good faith by simply saying so, and leaving the ultimate issue of Minister Sharon's morality to the arena of public debate, where it belongs. In applying *New York Times v. Sullivan,* courts should permit the press to demonstrate good faith by subsequent acts and declarations, just as plaintiff here has to an extent successfully claimed he should be able to demonstrate actual malice by such acts and declarations. Time is of course free to behave as it chooses, and to litigate all relevant issues aggressively. It will not be required to issue retractions or to behave moderately in the face of attacks on its good faith. But if the courts have special responsibilities in reviewing the evidence in libel cases, they must also have the responsibility to make clear the potential risks of a strategy enough in advance

so as to avoid the kinds of findings and verdicts that the Supreme Court has ordered scrutinized after the fact. This memorandum will serve to put both sides on notice of the risks they run in this litigation. Plaintiff runs the risk of losing on the basis of substantial truth, even if he succeeds in proving the story actually printed about him was false. Defendant runs the hazards involved in converting the litigation from a low-risk dispute primarily over its reporters' actual malice into a potentially high-stakes venture in which a substantial recovery will be a real possibility. In reviewing the verdict that results, neither this court nor any other is likely to disregard the parties' conscious decisions to accept these risks.

In conclusion, the parties should avoid the temptation to vent their increasingly inflamed views of each other in a drama whose conclusion could be a major disaster for at least one of them. A detached view of the evidence suggests that neither side deserves to suffer such a disaster; and any realistic view of the litigation process recognizes that the verdict ultimately rendered will be the product of inexpert and unscientific judgments, made on the basis only of the available and admissible evidence.

The motion to strike witnesses on the issue of "substantial truth" is denied, but defendant is ordered to limit both the extent and nature of such testimony as described above. Although publication of this Memorandum would be unlikely to affect the jury in any respect, its disclosure is hereby ordered limited to the parties and their attorneys so as to avoid any possible disclosure to the finders of fact.

SO ORDERED.